UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

              :

UNITED STATES OF AMERICA     :

              :

     - v. –      :     S2 17 Cr. 686 (LAK)

              :

JAMES GATTO, a/k/a "Jim,"    :
MERL CODE, and       :
CHRISTIAN DAWKINS,     :

              :

     Defendants.     :

------------------------------------------------------------------X


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


        ROBERT S. KHUZAMI
        Attorney for the United States
        Acting Under Authority Conferred
        by 28 U.S.C. § 515


Edward B. Diskant
Noah Solowiejczyk
Eli J. Mark
Aline R. Flodr
Assistant United States Attorneys
   - Of Counsel -

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT……………………………………………………………….1

THE COURT SHOULD PRECLUDE THE DEFENDANTS' EXPERT WITNESS……………1

I. THE COURT SHOULD PRECLUDE THE DEFENDANTS' EXPERT WITNESS………….1

II. THE COURT SHOULD PRECLUDE EVIDENCE, CROSS-EXAMINATION AND
REFERENCE TO PRIOR NCAA RULES VIOLATIONS INVOLVING THE VICTIM
UNIVERSITIES ……. ……………………………………………………………………….16

III. THE COURT SHOULD PRECLUDE EVIDENCE, CROSS-EXAMINATION AND
REFERENCE TO PRIOR NCAA RULES VIOLATIONS INVOLVING NON-VICTIM
UNIVERSITIES…………………………………………………………………………26

CONCLUSION………………………………………………………………………30

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in support of its motions *in limine* in advance of the trial of defendants James Gatto, Merl Code, and Christian Dawkins, scheduled to begin on October 1, 2018.  As set forth below, the Government seeks pretrial rulings as to the following issues.  *First*, the Government seeks to preclude the defendants' expert witness.  *Second*, the Government seeks to preclude evidence, cross-examination, and reference to prior NCAA rules violations involving the victim Universities.  *Third*, the Government further moves to preclude evidence, cross-examination, and reference to any NCAA rules violations involving universities other than the victim Universities.  ███████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

For the reasons that follow, the Motions should be granted.

## I.     THE COURT SHOULD PRECLUDE THE DEFENDANTS' EXPERT WITNESS.

*First,* the Government moves *in limine* to preclude the defendants from offering the expert testimony of Dr. Daniel A. Rascher whose proffered testimony is not relevant and is, in significant part, either beyond the scope of his expertise or not sufficiently reliable to meet the requirements of Rule 702.  In the alternative, the Government requests a *Daubert* hearing to determine the relevance and reliability of the experts' opinions.

### RELEVANT BACKGROUND

On August 24, 2018, the defendants provided notice of their intention to call Dr. Daniel A. Rascher as an expert witness at trial, along with a summary, written by defense counsel, of the subject matters as to which Dr. Rascher would be expected to testify.  (The "Expert Notice") (annexed hereto as Exhibit A).  On September 7, 11, 13, and 14, 2018 the defendants

supplemented their Expert Notice with certain materials Dr. Rascher "relied upon in reaching his

conclusions" and "economic models . . . developed by Dr. Rascher and upon which some of his

opinions are based." (the "Underlying Data Production") (collectively, the "Expert Disclosure").[1]

According to the Expert Disclosure, Dr. Rascher, an economist by training who currently runs

the "Sports Management Program" at the University of San Francisco, will provide his opinion

that the "value provided by an elite [men's basketball] player to a Division I University generally

outweighs the potential harm that may result from recruiting the athlete via means prohibited by

the NCAA." (Ex. A at 2.)  The defendants further seek to elicit from Dr. Rascher his opinions on

such matters as the "quantitative" and "qualitative benefits" – including in increased student

applications and enrollment, increased academic standards and graduation – that flow to

universities from successful college basketball programs, as well his view of the "risks

associated with breaking NCAA rules," apparently premised on, among other things, his "notion

that recruiting violations often go undetected and unpunished." (Ex. A at 5-6, 9-10.)

     According to the Expert Notice, the above testimony is relevant: (1) "to contradicting the

Government's claim that Defendants engaged in a scheme for the specific purpose of exposing

the Universities to tangible economic harm" or, relatedly, "to Defendants' defenses that no

scheme to defraud the Universities into awarding athletic scholarships existed," and (2) "to

---

[1] Since receiving the Expert Disclosures, and as more specifically noted below, the Government
has identified for the defendants several areas in which it believes it currently lacks sufficient
information to understand the "bases and reasons" for the opinions Dr. Rascher intends to offer
at trial.  *See* Fed. R. Crim. P. 16(b)(1)(C).  The Government is currently in the process of
working with defense counsel in an effort to address these issues, but the instant motion is based
solely on the information currently available, and the Government reserves the right to
supplement this motion as necessary upon receipt of additional information.

Defendants' defenses concerning materiality and their lack of intent to defraud the Universities

out of money." (Ex. A at 1.)

## APPLICABLE LAW

Rule 702 of the Federal Rules of Evidence provides, in relevant part:

A witness who is qualified as an expert by knowledge, skill, experience, training,
or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the
case.

The party that proffers the testimony bears the burden of showing that it is admissible.

*See Bourjaily v. United States*, 483 U.S. 171, 172-73 (1987).  The Court is the "gatekeeper" of

such evidence*, see, e.g.*, *United States v. Rosario*, No. 09 Cr. 415 (VEC), 2014 WL 6076364, at

*1 (S.D.N.Y. Nov. 14, 2014),  and, in that capacity, "must make several determinations before

allowing expert testimony: (1) whether the witness is qualified to be an expert; (2) whether the

opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on

a particular issue will assist the trier of fact."  *Tiffany (NJ) Inc. v. eBay, Inc.,* 576 F. Supp. 2d

457, 458 (S.D.N.Y. 2007) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir.

2005)).  Furthermore, even if all these requirements are met, the Court may nonetheless exclude

the expert testimony under Federal Rule of Evidence 403 if its prejudicial effect substantially

outweighs its relevance. *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001). The Court's

exclusion of expert testimony will be affirmed unless it constitutes an abuse of discretion. *See*

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).

In evaluating admissibility, the threshold issue is whether the witness "is qualified as an expert" to render the proposed opinion. *See Nimley*, 414 F.3d at 396.  "Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give."  *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

Even if an individual is qualified, testimony from an expert is admissible only if the trial court determines that it is both relevant and reliable.  *See generally Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 589-90, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  In assessing the reliability of expert testimony, the court considers: "whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation."  *Nimely*, 414 F.3d at 396 (citing *Daubert*, 509 U.S. at 593-94).

The Second Circuit has emphasized that "it is critical that an expert's analysis be reliable at every step."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand."  *Id.*  Moreover, "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.  Accordingly, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions

4

reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."
*Amorgianos*, 303 F.3d at 266-67.

Finally, and if the Court satisfies itself that the expert's reasoning and methodology is
valid and applied reliably to the facts, the Court must assess whether the proffered expert
testimony is relevant and helpful to the jury. *See Kumho Tire*, 526 U.S. at 137; *Cary Oil Co. v.
MG Refining & Mkt., Inc.*, 257 F. Supp. 2d 768, 773 (S.D.N.Y. 2003) (excluding evidence that
"would be distracting to the jury, focusing them on [] irrelevant issue[s]"); *United States v.
Ferguson*, 246 F.R.D. 107, 116 (D. Conn. 2007) (limiting the use of certain evidence, the
introduction of which could have diverted the jury's attention to collateral questions and which
risked "creating a trial within a trial") (citation omitted).

### A. Dr. Rascher's Proffered Opinions are Not Relevant

Here, as an initial matter, and without even engaging in the full analysis required by Rule
702, the core conclusion to be offered by Dr. Rascher – *i.e.*, that the "value provided by an elite
[men's basketball] player to a Division I University generally outweighs the potential harm that
may result from recruiting the athlete via means prohibited by the NCAA" – is inadmissible
because it is completely irrelevant to this case.  Neither the value provided by an "elite [men's
basketball] player" recruited in violation of NCAA rules, nor the comparison of that value to the
risks of getting caught, is relevant to elements of any offense charged in the Indictment.  In
particular, such testimony is not probative as to either of the defendants' proffered theories of
relevance – namely, the defendants' criminal intent (or lack thereof) with respect to the charged
conduct, and the materiality of the false statements allegedly made as part of the charged
conduct.

With respect to the former, Dr. Rascher will not and could not offer any opinion as to the

defendants' knowledge or intent at any relevant time period.  Indeed, despite that proffered

theory of relevance, the defendants identify nothing in their Expert Disclosure that would suggest

that Dr. Rascher's testimony could be permissibly used to argue the defendants' lack of criminal

intent with respect to the charged scheme.  *Cf. United States v. DiDomenico*, 985 F.2d 1159,

1165 (2d Cir. 1993) (excluding expert testimony that attempted to tell the jury – either explicitly

or implicitly through "semantic camouflage"– that the defendant's actions demonstrated that she

lacked *mens rea*);  *In re Rezulin Prods. Liability Litigation*, 309 F. Supp. 2d 531, 547 (S.D.N.Y.

2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert

testimony."); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 183 (S.D.N.Y.

2008) (speculative expert testimony about intent "cannot be saved by couching [the expert's]

opinion as 'industry custom and practice'").  Indeed, "the question of intent is a classic jury

question and not one for the experts."  *Rezulin*, 309 F. Supp. 2d at 547 (quotation marks and

alteration omitted).

   With respect to the latter, Dr. Rascher offers no opinion (nor would be qualified to) on

the interests and decisionmaking processes of the universities.  Indeed, Dr. Rascher, according to

his CV, has never worked in an athletics department of a university, sat on a Board of Trustees

for a university, or held any position related to assessing a university's finances, branding, or

marketing.   Nor does he have any history of publishing or providing opinions on university

admissions, recruiting, administration and finances.  It is thus impossible to discern what

assistance Dr. Rascher's proffered testimony could offer to a jury in assessing the materiality of

the false statements at issue in this case.

   More generally, the proffered testimony seems intended to confuse the jury by offering a

legally insufficient and factually unsupported explanation for the defendants' conduct –

effectively an improper invitation to the jury to conclude that the universities must not have cared about being lied to, and that the defendants must not have intended to defraud the universities, because, according to an expert, who the defendants presumably had not met, and who created models and ran analyses the defendants could not have seen (since they had not yet been created), statistically, the universities were likely to end up profiting from the defendants' conduct.  This sort of evidence, argument or invited inference is plainly improper.  *Accord United States v. Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008) (affirming jury instruction incorporating the rule that a defendant's belief that his actions will cause no ultimate harm is not a defense to wire or mail fraud); *United States v. Koh*, 199 F.3d 632, 641 (2d Cir. 1999); *United States v. Berkovich*, 168 F.3d 64, 66-67 (2d Cir. 1999); *United States v. Watts*, 934 F. Supp. 2d 451, 470 (E.D.N.Y. 2013) (precluding argument that defendant believed his lies to a victim lender would cause no ultimate harm because the lender would be repaid); *United States v. Levis*, 488 F. App'x 481, 486 (2d Cir. 2012) ("[E]ven if Levis meant to cause no ultimate harm to investors because he honestly believed Doral to be properly valued, he intended to cause them immediate harm by denying them the right to control [their] assets by depriving [them] of the information necessary to make discretionary economic decisions." (alterations in original; quotation marks and citation omitted)); *United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) (same); *United States v. Chandler*, 98 F.3d 711, 716 (2d Cir. 1998) (affirming defendant's conviction for credit card fraud despite lack of evidence that credit card company suffered any loss as a result of defendant's fraud, because defendant's false statements about her identity "expos[ed] [the credit card company] to the risk that the applicant was less creditworthy than it believed").

       The Government must, of course, prove both that the defendants had the requisite

7

criminal intent and that the false statements were material or capable of causing tangible economic harm to the universities.  But Dr. Rascher's proffered testimony provides no proper or permissible assistance to the jury with respect to either issue.

Judge McMahon's decision in *United States v. Binday*, No. 12 Cr. 152 (CM), 2013 WL 12154927 (S.D.N.Y. Sept. 16, 2013), is instructive.  There, the defendants – who were charged with defrauding various insurance companies by submitting insurance policies containing materially false statements – sought to introduce evidence that the victim-insurance companies had actually profited during the relevant time period, ostensibly in an effort similar to the one here, *i.e.*, to suggest to the jury either that the misstatements were immaterial to the insurance companies, or that the defendants did not intend to harm them.  As Judge McMahon correctly ruled, such evidence was not "germane to anything relevant to this case, since such evidence does not rebut or negate any argument that the Insurers either (1) did not get what they reasonably expected to get, or (2) did not suffer financial harm as a result of their loss of the right to control their assets."  *Id.* at *5.  Consistent with that conclusion, the Court should preclude Dr. Rascher's testimony in its entirety as irrelevant.

### B.  Substantial Components of the Proffered Testimony Are Beyond the Scope of Dr. Rascher's Expertise

Moreover, even were the Court to look beyond this otherwise fatal flaw in Dr. Rascher's testimony, substantial components of that testimony would still remain objectionable as outside of Dr. Rascher's area of expertise, or not an appropriate subject for expert testimony. *Nimely*, 414 F.3d at 399 n. 13 ("[B]ecause a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").

8

As his CV makes clear, Dr. Rascher is an economist by training who serves as the director of a "Sports Management Program" at the University of San Francisco.  (Ex. A at 14.) While he has both testified and published extensively, substantially all of his testimony pertains to unrelated areas, namely professional sports and leagues.  Indeed, of his nearly 30 peer reviewed journal articles, just two pertain to college sports, one of which appears to focus exclusively on college football.  Similarly, while Dr. Rascher has been certified as an expert witness on numerous occasions involving professional sports teams and leagues, with respect to the NCAA, Dr. Rascher has only been qualified as an expert in several antitrust cases, where the scope of his expertise was generally limited to the issue of whether NCAA amateurism rules have an anticompetitive impact.[2]

Notwithstanding Dr. Rascher's well-defined, if limited, area of expertise, the defendants would have Dr. Rascher testify to a much broader variety of subjects.  Specifically, the defendants seek to have Dr. Rascher testify:

(1) With respect to the "quantitative benefits" associated with a five-star recruit, and based on "multiple regression analysis" and a "model," Dr. Rascher has concluded that "[t]he value provided to the Universities by a five-star athlete ranges from approximately $1 million to $4 million."  (*Id.* at 4.)

(2) With respect to the "qualitative benefits," the "NCAA itself" through the recently-released Rice Commission Report has recognized the "qualitative benefits to the university as a whole" from having a "prominent D1 basketball program," among them "potential for increased donations to the university, increases in both the quantity of applications and enrolled students, and improved changes in the quality of

---

[2] By letter dated September 11, 2018, the Government asked the defendants to specifically identify instances in which Dr. Rascher had been qualified as an expert on the issues identified in the Expert Disclosure.  By letter dated September 13, 2018, the defendants identified five cases in which Dr. Rascher had been permitted to "provide[] specific analysis regarding the *valuation of athletes*."  (Letter of Casey E. Donnelly dated September 13, 2018 at 4.) (annexed hereto as Exhibit B.)   That issue, of course, is at most a single component of the far wider ranging testimony the defendants would seek to elicit here.

the incoming freshman class," improved "student academic standards, retention and graduation" and "the effect of college athletics on brand and perception" (*Id.* at 5.)

(3) That "evidence supports the notion that recruiting violations often go undetected and unpunished." (*Id.* at 9-10.)

(4) That "economic models" demonstrate that "even in instances in which NCAA rule violations are detected and penalties imposed, the revenue of a university's basketball program are unaffected" and that Dr. Rascher's "model even provides some evidence to suggest that schools placed on probation by the NCAA actually saw statistically significant *increases* in the revenue for their [men's basketball] programs." (*Id.* at 11.); and

(5) That "from a purely cost-focused perspective, a university expends very few assets when awarding an athletic scholarship" because, according to Dr. Rasher, the "'list price' of an athletic scholarship substantially overstates the 'true cost' to a university." (*Id.*)

Substantial aspects of the proposed testimony are either outside of Dr. Rascher's area of expertise, or not an appropriate subject for expert testimony. For example, with respect to the third – *i.e.*, that "evidence supports the notion that recruiting violations often go undetected and unpunished" – the Expert Disclosure offers nothing to suggest that statement, even assuming its truth, is within the realm of Dr. Rascher's expertise. Dr. Rascher has no experience in college basketball recruiting, or NCAA compliance or enforcement. Indeed, he does not appear to have ever even published or testified on such topics, at least in any detail. Nor does the Expert Disclosure cite to any study or data conducted by Dr. Rascher in support of such an assertion. Instead, the defendants appear to rely almost entirely on snippets of a report from the Commission on College Basketball (the "Rice Commission Report") – a report Dr. Rascher had no role in preparing and which is, itself, hearsay[3] – and which, in turn, in relevant part, collects

---

[3] The defendants cite to and quote extensively from the Rice Commission Report throughout their Expert Notice. (*See, e.g.*, Ex. A  at 3, 5, 9, 10 & nn. 1, 2, 6, 18-19, 21-24.)  However, the report itself is plainly inadmissible, and the defendants may not use a proposed expert to simply act as the mouthpiece for the "factual narrative" reported by the Commission on College

10

and summarizes the anonymous statements of additional third parties. *See generally* Fed. R.

Evid. 703 (expert may not disclose to the jury"[f]acts or data that are otherwise inadmissible"

unless the court determines that their probative value substantially outweighs their prejudicial

effect, and the facts or data must be "of a type reasonably relied upon by experts in the particular

field forming opinions or inferences upon the subject").

 With respect to the second and fifth, both of which turn generally on issues of university

administration and finance, the defendants would again seek to have Dr. Rascher opine on issues

that extend well beyond his qualifications as an expert.  With respect to the second – the

"qualitative benefits" of recruiting top student-athletes – as the Expert Notice itself makes clear,

Dr. Rascher has no first-hand experience or expertise in these areas but instead intends, if

permitted, to simply regurgitate the findings of others, including many non-scientific "studies,"

such as the Rice Commission Report.[4]  *Cf. United States v. Mejia*, 545 F.3d 179, 195, 197-98 (2d

Cir. 2008) ("[A]n expert must form his own opinions by applying his extensive experience and a

reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating

hearsay evidence without applying any expertise whatsoever.").  Indeed, that section of the

Expert Notice is devoid of a single citation to anything Dr. Rascher has ever published, or

---

Basketball.  *See Tourre*, 950 F. Supp. 2d at 666 ("Acting simply as a narrator of the facts does
not convey opinions based on an expert's knowledge and expertise; nor is such a narration
traceable to a reliable methodology.").

[4] Indeed, significant components of the hearsay Dr. Rascher intends to repeat is not even of the
expert variety.  For example, the defendants contend that Dr. Rascher will testify as to how the
"qualitative benefits described in the *academic literature* can be directly observed in the case of
the University of Louisville."  (Ex. A at 8).  However the Expert Notice proceeds to summarize
an ESPN article based on a limited amount of publicly available information, and the Expert
Notice provides no reason to believe Dr. Rascher either has first-hand knowledge of that
information or that he brought his "expertise" to bear in reaching conclusions espoused by two
sports journalists.

mention of any work, analysis, data or expertise Dr. Rascher has personally contributed to.
Moreover, to the extent Dr. Rascher's testimony is simply intended to demonstrate that there is
value to a university as a whole of having a good basketball team, such a matter is an issue "a
jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro–
North Commuter R.R. Co*., 882 F.2d 705, 708 (2d Cir. 1989).

With respect to the fifth – the "true cost" to a university of issuing an athletic scholarship
– and without rehashing arguments made above with respect to the limited scope of Dr.
Rascher's expertise, the Expert Disclosure provides neither any basis for Dr. Rascher's various
conclusions, nor any suggestion that they are the product of his expertise.  For example, Dr.
Rascher apparently intends to opine that "tuition for an athlete . . . costs a university $0 in out-of-
pocket cost"; that "[p]roviding a dorm room is also virtually costless if the school has excess
dormitory capacity" and more generally that the "majority of" the components of a scholarship
are "provided in-kind and involve no out-of-pocket cost to the university."  (Ex. A at 11.)
However, Dr. Rascher cites nothing to support those conclusions, nor does the Expert Disclosure
identify any basis for concluding he has expertise in an area which undoubtedly varies wildly by
institution and circumstance.

### C.  Dr. Rascher's Economic Models and Regression Analyses Are Neither Reliable Nor Useful to the Jury

Alternatively, and even with respect to those areas which are arguably within the scope of
his expertise – *i.e.*, Dr. Rascher's "multiple regression analysis" ostensibly demonstrating the
quantitative benefit to the university from recruiting the student athlete, and his "model"
ostensibly establishing the economic impact, or lack thereof, on a men's basketball program
found to have violated NCAA rules – the analysis is neither sufficiently reliable nor sufficiently

useful to the jury to be admissible.

With respect to the first – Dr. Rascher's "multiple regression analysis . . . which measured the relationship between the talent level of all recruits on a college basketball team and the amount of revenue that the team brought in each year" – there is no indication this method has been subject to peer (or any) review, or indeed has been adopted by anyone other than Dr. Rascher.  The process – which apparently entails adding the "star ranking" of every member of a college team and comparing that to the total revenue a team brings in – is, as an initial mater, built upon entirely unscientific data points, foremost among them the "star ranking" assigned to various high-school aged recruits by an entirely unscientific website.  *Cf. Amorgianos*, 303 F.3d at 267 ("[I]t is critical that an expert's analysis be reliable at every step.").  Moreover, *at best*, this "model" appears to conflate "correlation" with "causation" in a manner that renders its outcome insufficiently reliable to be probative.[5]  Not surprisingly, the product is a wide range – "approximately $1 million to $4 million dollars" – that is itself of little relevance to a jury in evaluating any issue in dispute in this case.  Indeed, as argued more fully in Section A, above, even if such a range was the result of a reliable method, it would be of no relevance to the jury in this case.  That is particularly true given that explaining the model will necessarily entail lengthy testimony about players and universities of no relevance to this case.

With respect to the second – Dr. Rascher's use of a "regression analysis" and "benchmarking analysis" to determine the effect of a probationary term on revenues for a men's

---

[5] As noted above, at present, the Government does not have access to significant information about how this "model" was run, including the "dependent variable" and "additional explanatory variables" referred to in the Expert Notice.  (Ex. A at 4.)  The Government is working with defense counsel on this issue and hopes to be able to resolve it shortly, but as noted, the instant motion is based principally on the information contained in the Expert Notice, which is not itself sufficient to permit the Government to fully assess the reliability of the model.

basketball program – there is again no indication this method has been subject to peer review or publication, that it has been widely (or ever) accepted, or that it has ever been used elsewhere. There is strong reason to believe, based on the information provided in the Expert Notice, that Dr. Rascher is only evaluating sanctions imposed at a limited number of schools (most completely irrelevant to this case), and comparing the fact of a sanction to a very limited sliver of revenue, namely the revenue exclusively attributed to a men's basketball program, a comparison that fails to account for, among other things, university-wide revenue fluctuations, and all of the qualitative values (and harms) detailed above. More generally, there is again strong reason to believe that this analysis[6] is little more than another improper conflation of temporal "correlation" with "causation," particularly given the seemingly implausible conclusion drawn from his analysis that being placed on probation actually *helps* the profitability of a university's men's basketball program.  (*E.g.*, Ex. A at 11.)

And while, of course, all of this can be explored through cross-examination if necessary, where the proffered testimony and underlying methodology is insufficiently reliable to provide a plausible explanation of causation, the testimony is properly excluded as needlessly confusing and irrelevant to a jury.  *See, e.g.*, *Kumho Tire*, 526 U.S. at 154-55 (upholding the exclusion of an expert's testimony that a defect caused a tire's tread to separate from the rest of the tire, because the expert's theories could not reliably determine the cause of the separation in the tire at issue); *Amorgianos*, 303 F.3d at 269-70 (upholding district court's exclusion of expert testimony

---

[6] With respect to this model, the Government does not presently have access to what "the specific financial and competitive outcomes" referred to in the Expert Notice consist of, what the "relevant alternative explanatory factors" that were "control[ed] for" consist of, or what the "school fixed effects, conference-level fixed effects, [and] year fixed effects," that were "controlled for" consist of.  (Ex. A at 10-11.)

where court "reasonably conclud[ed] that the analytical gap between the studies on which she relied and her conclusions was simply too great and that her opinion was thus unreliable.")  That is particularly true where, as here, the ultimate conclusion, even if reliable, is not relevant to the jury in this case.

### D.  In the Alternative, the Court Should Order a *Daubert* Hearing

For the reasons set forth above, the Government respectfully submits that the testimony of Dr. Rascher can and should be precluded in its entirety as irrelevant, beyond the scope of his expertise, and unreliable.  However, in the alternative, the Government requests that the Court schedule a factual hearing so that the Court may further explore the bases for and reliability of Dr. Rascher's models, analyses and opinions before he is permitted to testify.  *See generally Daubert*, 509 U.S. at 579 (district court may, in its broad discretion, order a factual hearing pursuant to Rule 104 to determine whether expert testimony is reliable); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007) ("Whether to hold a *Daubert* hearing is within the discretion of the court.").  In particular, the Government submits that Dr. Rascher should not be permitted to opine on the models or analyses described above without further factual development as to the methodology used and its reliability.

15

## II.     THE COURT SHOULD PRECLUDE EVIDENCE, CROSS-EXAMINATION AND REFERENCE TO PRIOR NCAA RULES VIOLATIONS INVOLVING THE VICTIM UNIVERSITIES.

The Government respectfully moves to preclude the defendants from introducing evidence, eliciting on cross-examination, or otherwise referencing or making arguments regarding past, unrelated major NCAA rules infractions[7] involving the four victim Universities. In particular, and as set forth below, the prior NCAA violations involving the victim Universities do not in any way resemble the circumstances presented here, and any minimal probative value added by exploring these past NCAA violations is far outweighed by their prejudicial effect, including the potential to distract the jury regarding tangential and irrelevant matters. Accordingly, cross-examination, evidence, or arguments regarding these prior major NCAA rules violations should be precluded.

Additionally, and to the extent the defendants intend to cross-examine witnesses, admit evidence, or otherwise reference more recent, minor NCAA rules infractions involving the victim Universities (*i.e.* infractions other than those reported in the publicly available NCAA major infractions database), the defendants should, at bare minimum, be required to specifically identify these NCAA rules violations in advance of trial and articulate why these specific violations are relevant to the matters at issue in this trial.  Requiring the defendants to identify these subjects in advance of trial will afford the Government time to respond, and will allow the Court adequate time to weigh the probative value of such evidence against its prejudicial effect prior to trial.

---

[7] As described below a "major" or "Level I" rules infraction as used in this context is a term of art, and such rules infractions are publicly reported in a database maintained by the NCAA.

A.      **Background**

There are different levels of infractions depending on the severity of an NCAA rules

violation.  A "Level I Violation" is the most severe type of violation, and involves a "severe

breach of conduct." NCAA Division I Bylaw § 19.1.1.  Level I Violations are described as

conduct that "seriously undermine or threaten the integrity of the NCAA Collegiate Model,

including any violation that provides or is intended to provide a substantial or extensive

recruiting, competitive or other advantage, or a substantial or extensive impermissible benefit."

NCAA Division I Bylaw § 19.1.1.  The NCAA Division I Bylaws provide examples of

circumstances that may constitute a Level I Violation, including "individual unethical or

dishonest conduct," "cash payment or other benefits provided by a coach, administrator or

representative of the institution's athletics interests intended to secure, or which resulted in,

enrollment of a prospective student-athlete," "third-party involvement in recruiting violations in

which institutional officials knew or should have known about the involvement," and

"intentional violations or reckless indifference to the NCAA constitution and bylaws."  NCAA

Division I Bylaw § 19.1.1.[8]

Of the four victim Universities, only the University of Louisville and the University of

Miami have been the subjects of a Level I violation or major violation within the past 10 years.

With respect to the University of Louisville, on or about June 15, 2017, the NCAA Division I

---

[8] Prior to in or about 2013, the NCAA had a two-tier violation structure consisting of "major"
and "secondary" violations.  Under the prior violation structure, all violations were considered
"major" violations other than "secondary" violations, which the NCAA defined as "a violation
that is isolated or inadvertent in nature," that "provide[d] or [was] intended to provide only a
minimal recruiting, competitive or other advantage and [did] not include any significant
impermissible benefit (including, but not limited to, an extra benefit, recruiting inducement,
preferential treatment or financial aid)."  NCAA Division I Bylaw (Aug. 1, 2011) § 19.02.2.1.

Committee on Infractions ("COI") announced that it was imposing penalties against the university as a result of a Level I violation involving the director of men's basketball operations arranging for "a local escort to bring female strippers and prostitutes to a dormitory on nights when prospects were staying there," where "the women performed striptease dances for the prospects and, occasionally, student-athletes." (June 15, 2017 NCAA Division I Committee on Infractions Public Infractions Decision ("2017 Louisville COI Decision"),[9] at 1). According to the COI's decision, "[o]n 10 occasions, one or more of the prostitutes performed sex acts on and/or with prospects, an enrolled student-athlete, and a prospect's friend." (*Id.*). In addition "[o]n two occasions, the . . . director of men's basketball operations arranged, through the escort, for prostitutes to have sex at local hotels with the nonscholastic basketball coaches of two prospects being recruited by the institution." (*Id.*). Certain of the prospects who engaged in sex acts with the prostitutes were minors. (*Id.*). "The student-athletes who participated in the striptease dances, prostitution and 'tipping' of the strippers became ineligible for competition" according to the 2017 Louisville COI Decision. (*Id.* at 22). This conduct occurred between approximately in or about 2010 and in or about 2014. The director of men's basketball operations involved in the conduct left the University of Louisville in or about April 2014 prior to the revelations coming to light to take a position as an assistant men's basketball coach at another university. (*Id.* at 4).

Once the University of Louisville learned of the conduct and the NCAA investigation of said conduct, the University of Louisville voluntarily took certain steps prior to the COI

---

[9] A copy of the 2017 Louisville COI Decision is available at:
https://www.ncaa.org/sites/default/files/2017INF_LouisvillePublicInfractionsDecisionF_201706
15.pdf

imposing penalties.  These measures included, among other things, retaining an individual to conduct an independent misconduct risk assessment, including conducting on-campus interviews with athletics administrators, coaches, staff and students, and adding additional rules education by providing host training sessions for all student-athletes.  The University of Louisville further voluntarily agreed to certain restrictions and penalties before the 2017 Louisville COI Decision was issued, which included, among other things: (i) reducing the number of official visits in the sport of men's basketball; (ii) reducing its number of recruiting days; (iii) ending the 2015-2016 men's basketball season with its last regular season game and not participating in postseason conference or NCAA tournament competition; and (iv) reducing the number of men's basketball athletic scholarships available.  (*Id.* at 22-24).

In addition to these institution imposed penalties, the NCAA imposed penalties that included, among other things: (i) placing the men's basketball program on probation for four years; and (ii) requiring that the University return to the NCAA all monies it had received to date through conference revenue sharing associated with its appearances in the 2012 through 2015 NCAA Division I Men's Basketball Tournaments and withholding any future revenue distributions to the University associated with those tournaments.  (*Id.*).  Furthermore, because the conduct rendered the student-athletes and prospective student-athletes involved ineligible to compete and the violations "were serious, intentional, numerous and occurred over multiple years," the NCAA required that the University of Louisville vacate all wins "in which ineligible student-athletes competed," which included its NCAA Division I men's basketball championship in 2013 (*Id.* at 26).[10]  The NCAA further required that the head men's basketball coach[11] be

---

[10] The University of Louisville filed an appeal with the NCAA with respect to certain aspects of

suspended for the first five conference games because he "failed in his duty to monitor the activities of the former operations director, a member of his staff who reported directly or indirectly to him." (*Id.* at 24).  The COI, however, noted that "no one who was interviewed during the investigation provided any information showing that the head coach was aware of the stripteases and prostitution" and that the student-athletes and prospects interviewed "made it a point not to talk about the incidents" because "if the head coach became aware of the incidents, he would have . . . 'flipped out.'" (*Id.* at 11).[12]

The University of Miami was the subject of a major infraction in 2013.  The 2013 infraction related to conduct spanning in or about the early 2000s until in or about 2010 and involved, among other violations, a booster entertaining multiple prospects and current student-athletes at his home, on his yacht, and in other public settings, which included the booster paying for entertainment, food, and various gifts. (October 22, 2013 NCAA Division I Committee on Infractions Public Infractions Decision ("2013 Miami COI Decision")[13], at 1)).  In addition, the COI found that former men's basketball coaches were involved in recruiting violations that included providing impermissible benefits or inducements to prospective student-athletes, and, at

---

the penalties imposed.  The appeal was denied in or about February 2018.

[11] The head men's basketball coach at the time of the conduct at issue in the 2017 Louisville COI Decision was also the head men's basketball coach at the time of the conduct alleged in the Indictment.

[12] The University of Louisville's only other major infractions date back to 1998, 1996, and 1957.  The 1998 infraction generally involved women's volleyball prospective student-athletes being provided financial assistance, temporary lodging, automobile transportation, and free dental care, among other things, and the 1996 infraction involved athletics department representatives and an assistant men's basketball coach providing extra benefits to student-athletes, including one instance where a small amount of cash was provided to a men's basketball student-athlete.

[13] A copy of the 2013 Miami COI Decision is available at: https://www.ncaa.org/sites/default/files/Miami%20Public%20Inf%20Rpt.pdf

times using the booster to facilitate providing these benefits to the prospects.  (*Id.* at 3).  The

conduct involved in the 2013 infraction ended prior to the hiring of the current head men's

basketball coach in or about 2011 and the hiring of the current Director of Athletics in or about

2013.  The only other major infractions involving the University of Miami occurred in 1995 or

earlier.

North Carolina State University has had no major infractions since 1989.  The infractions

involved extra benefits and improper recruiting inducements.  The University of Kansas has not

been the subject of a major infraction since 2006.  The 2006 infraction involved a representative

of the institution's athletics interests supplying cash, transportation, clothing and other benefits to

two men's basketball student-athletes, including when the student-athletes were not yet in

college.  The total value of the services and items provided to the student-athlete, members of his

family and his AAU coach, were a few thousand dollars.  The other major infractions involving

the University of Kansas occurred in 1988 and earlier, and also involved improper inducements

and extra benefits, among other violations.

**B.     Argument**

Here, none of the above-described major NCAA rules violations have any bearing on the

specific facts of this case.  Nor do they serve to negate any element of the offenses charged

because none indicate that the universities encouraged, tolerated, or expected the sort of false and

fraudulent representations made here. *Cf. Binday,* 2013 WL 12154927, at *1-2 (evidence that

victim insurers "were actually well aware of, encouraged, or at a minimum, consciously avoided,

the defendants' efforts, along with the efforts of hundreds of other similarly-situated life

insurance agents, to procure life insurance policies for sale to investors" was potentially

admissible depending on particular factual circumstances).

21

First, with respect to the circumstances surrounding the 2017 Louisville COI Decision, there is nothing about that incident that in any way suggests that the University of Louisville would consider it immaterial that a prospective student-athlete's family accepted a large cash payment in connection with that student-athlete's decision to matriculate at the university, or that the university would be indifferent to the fact that such a payment would render the student-athlete ineligible to compete.

With respect to the probative value, the violation at issue in the 2017 Louisville COI Decision has nothing to do whatsoever with the conduct alleged in the Indictment.  The only possible commonality between the 2017 Louisville COI Decision and the allegations in this case is that both incidents involve improper inducements and extra benefits to prospective student-athletes.  But the similarities end there.  The type of inducement involved is entirely different, with the facts of this case involving a large cash payment, and the prior NCAA rules violation by Louisville involving the provision of strippers and prostitutes.  Furthermore, whereas this case involves a payment to a family member of a prospective student-athlete, the conduct involved in the 2017 Louisville COI Decision related to improper benefits being provided directly to the student-athletes themselves.

More fundamentally, the response of the University of Louisville to the incident is entirely inconsistent with any suggestion that the University condoned or otherwise did not take the extra benefits and improper inducements that had been provided seriously.  Indeed, before the NCAA had imposed any penalties, the University voluntarily agreed to, among other things, reduce the number of men's basketball athletics scholarships and voluntarily sit out from postseason play.  (*Id.* at 22-24).  Accordingly, any argument that this conduct shows that the University of Louisville did not find the representations regarding the eligibility of its student-

athletes material in making scholarship decisions lacks merit.  Nor is anything about the conduct at issue in the 2017 Louisville COI Decision probative of the fact that the University purportedly was aware of, encouraged or consciously avoided learning of the misrepresentations caused by the defendants in this case.  To the contrary, there is nothing about the circumstances of the 2017 Louisville COI Decision that suggests that the University knew of the NCAA rules violations and chose to ignore them.

The limited relevance of this prior NCAA rules violation stands in stark contrast to the evidence that the defendants in *United States v. Binday* were ultimately permitted to present to the jury that the defendants contended showed that the insurance companies had not been deceived by their misrepresentations.  *Binday*, 2013 WL 12154927, at *1.  In particular, the defense was permitted to introduce evidence that (1) one of the victim insurers had implemented policies that were designed to prevent the sale of insurance policies that were suspected to be Stranger Owned Life Insurance ("STOLI") policies, but that the company quickly abandoned these measures when the number of insurance applications dropped precipitously; (2) a victim insurance company had identified one of the defendant insurance agents as being involved in procuring STOLI policies, yet the company continued to issue policies to his clients and to reward him with other perks and benefits; and (3) that the application materials of certain of the defendants' clients contained red flags that the policies might be STOLI, as well as red flags regarding incorrect financial information, yet the insurers issued the policies nevertheless.

By contrast, here, there is nothing about the conduct at issue in the 2017 Louisville COI Decision that suggests that the University of Louisville, in actuality, had knowledge or otherwise consciously tried to avoid learning of whether the representations regarding its student-athletes' eligibility to compete were, in fact, true.  Rather, if anything the incident demonstrates that the

23

University of Louisville took the NCAA rules violations seriously once they were discovered, and that it took measures to try to prevent similar types of violations occurring in the future, as well as voluntarily agreeing to the imposition of penalties.  In short, unlike in *Binday*, nothing about the 2017 Louisville COI Decision suggests that the university detected NCAA rules violations and chose to ignore them.

Furthermore, to the extent the defendants seek to use the evidence regarding the 2017 Louisville COI Decision to argue or otherwise imply that the University of Louisville was negligent or otherwise careless in preventing NCAA rules violations and/or detecting misrepresentations by student-athletes regarding their eligibility to compete, such arguments fail as a matter of law.[14]  It is black-letter law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to a federal wire or mail fraud charge. *See Binday,* 2013 WL 12154927, at *1 (noting "the Government's (correct) statement of the law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to mail or wire fraud.") (citing *United States v. Isola*, No. 10 Cr. 833 (WHP), 2012 WL 243083, at *1 (S.D.N.Y. Jan. 11, 2012); *United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004); *United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007)).

By contrast, any minimal probative value provided by permitting the defense to cross-examine witnesses or introduce evidence regarding the 2017 NCAA rules violation is substantially outweighed by the danger of undue prejudice that would result from cross-

---

[14] It bears noting that in the defendants' objections to the Government's requests to charge (Dkt. No. 183), the defendants objected to a proposed charge stating that "it does not matter whether the universities might have discovered the fraud had it probed further. If you find that a scheme to defraud existed, it is irrelevant whether you believe that the universities were careless, gullible, or even negligent." (*Id.* at 11-12).

examination or evidence regarding highly sensational conduct of no direct relevance to this case.
*See* Fed. R. Evid. 403.  As detailed above, the 2017 Louisville COI Decision involves, among
other things, a member of the athletics department staff providing strippers and prostitutes to
minors.  The introduction of such evidence will distract the jury from the relevant questions at
hand and will needlessly inject extraneous matters into the trial.  In addition, allowing the
defendants to conduct cross-examination or introduce evidence regarding this prior NCAA rules
violation risks confusing or misleading the jury to draw impermissible inferences that the
university was negligent or careless and that thus the defendants should not be held responsible
for the misrepresentations that they caused to be made to the university as a result.  *See United*
*States v. Lesniewski*, No. 11 Cr. 1091 (VM), 2013 WL 3776235, at *2 (S.D.N.Y. July 12, 2013)
(excluding evidence of victim negligence as irrelevant under Federal Rule of Evidence 401 and
further explaining that, "even if it somehow passed the test of relevance," it was inadmissible
under Federal Rule of Evidence 403 because "[s]uch evidence might allow the jury to improperly
conclude that, even if it found that Defendants did engage in fraudulent conduct as charged, they
should not be held responsible because the [target of the fraud] should have known about the
fraud in question."); *cf. United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) (slightness of
evidence's probative value increases likelihood that it will be considered by the jury for its
improper purpose).

With respect to the other major NCAA rules violations involving the victim Universities
described above, the Government respectfully submits that none of these other violations – all of
which involve conduct that is between approximately 8 and 51 years old – have any significant
probative value and are simply irrelevant.  The 2013 infraction involving the University of
Miami, for example, involves the provision of improper benefits to student-athletes that occurred

from 2005 to 2010, and predated the current men's college basketball coach and the Athletic

Director.  The conduct at the University of Kansas and North Carolina State University is even

older, and while the risk of prejudice is nowhere near as high given the nature of the conduct

involved, the risk of juror confusion remains, particularly in light of the minimal probative value

of such conduct.

Finally, to the extent the defendants will seek to introduce evidence of or conduct cross-

examination regarding other more recent NCAA rules violations that are not reflected in the

NCAA's major infractions database, the Government respectfully submits that the Court should

require that the defendants identify these NCAA rules violations in advance of trial and articulate

their relevance to the matters at-issue.  While the Government is skeptical that any more recent

minor NCAA rules violations by the victim Universities would be probative of *anything*, the

Government respectfully requests that the Court require the defendants to address these issues in

advance of trial so that the Government has an opportunity to respond, and so that the Court has

an opportunity to conduct a Rule 403 balancing analysis.

III.  **THE COURT SHOULD PRECLUDE EVIDENCE, CROSS-EXAMINATION AND REFERENCE TO PRIOR NCAA RULES VIOLATIONS INVOLVING NON-VICTIM UNIVERSITIES.**

The Court should further preclude the defendants from introducing evidence, eliciting on

cross-examination, or otherwise referencing or making arguments regarding past NCAA rules

violations by any universities other than the four victim Universities.  Any evidence or cross-

examination on this subject would not only be irrelevant, but would also have the effect of

confusing and misleading the jury.  The Government respectfully submits that, pursuant to

Federal Rules of Evidence 401 and 403, the Court should preclude evidence related to

universities other than the victim Universities identified in the Indictment that the Government intends to prove at trial were defrauded.

Rule 401 defines relevant evidence as evidence that "has a tendency to make a fact [of consequence] more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Under Rule 403, a court may "exclude[e] [even] relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury. . . ." Fed. R. Evid. 403.

Here, evidence or cross-examination about prior NCAA violations by universities other than the victim Universities identified in the Indictment would be of no consequence to any of the issues that the jury must decide in connection with the three counts of the Indictment.  Nor is it clear that any of the witnesses would have firsthand knowledge of such violations.  The conduct of other Universities is not relevant to the question of whether the Universities in this case considered the misrepresentations caused by the defendants to be material.  Furthermore, evidence regarding other Universities' practices, failures to adequately address red flags of NCAA rules violations, or complicity or encouragement of NCAA rules violations is not relevant to whether the victim Universities in this case were, in fact, deceived.[15]

Courts in this District have recognized under analogous circumstances that cross-examination and presentation of evidence regarding non-victim entities is not appropriate in the fraud context.  In *United States v. Cherico*, 08 Cr. 786 (CM) –  a case involving false statements

---

[15] To the extent the defense seeks to present examples of prior NCAA rules violations by non-victim universities to argue that the penalties associated with certain types of NCAA rules violations are *de minimis* and thus would not result in actual economic harm to the universities, such evidence would be irrelevant because it is the *risk* of harm to the victim (of which, the NCAA penalty would be only one example), not demonstrable proof of actual harm, that is required.

to banks in mortgage applications – the defendants sought to elicit testimony about practices and policies of banks other than the banks that the Government had identified as victims.  The district court ruled that, while the defendant had a right to present evidence to rebut proof of materiality of the false loan application statements, evidence regarding the practices of non-victim banks was not relevant to this issue.  As the district court stated, any evidence regarding lack of materiality must "relate to the lending practices of the particular bank at issue at the time at issue."  *See United States v. Cherico*, 08 Cr. 786 (CM), Oct. 17, 2011 Transcript (annexed hereto as Exhibit C), at 5.

In sum, evidence or cross-examination regarding prior violations of the NCAA rules by universities who are not alleged to be victims is of little to no probative value, and allowing such topics to be explored would confuse the issues and mislead the jury.

## <u>CONCLUSION</u>

For the reasons set forth above, the Government respectfully submits that the Motions should be granted.

Dated: New York, New York
       September 14, 2018

                          Respectfully submitted,

                          ROBERT S. KHUZAMI
                          Attorney for the United States
                          Acting Under Authority Conferred
                          by 28 U.S.C. § 515

              By:    _____/s/_____
                          Edward B. Diskant
                          Noah Solowiejczyk
                          Eli Mark
                          Aline R. Flodr
                          Assistant United States Attorneys
                          Tel.: (212) 637-2294/2473/2431/1110

30