## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

        :     Case No. 17-cr-00686-LAK

v.        :

        :

JAMES GATTO,        :

a/k/a "Jim,"        :

MERL CODE, and        :

CHRISTIAN DAWKINS,        :

        :

    Defendants.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM
## ON BEHALF OF MERL CODE

**NEXSEN PRUET LLC**
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE DEAKINS NASH
SMOAK & STEWART**
Merl F. Code
300 N Main St, Suite 500
Greenville, South Carolina 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION .................................................................................................................. 1

BACKGROUND ..................................................................................................................... 2

APPLICABLE LAW .............................................................................................................. 4

THE APPROPRIATE SENTENCE ...................................................................................... 8

I.      CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE. ............................................................................................................ 8

    A.   Mr. Code's History and Character. .............................................................. 8

    B.   The Nature and Circumstances of the Offense. ........................................ 15

    C.   A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases. ........................................................................ 15

    D.   A Non-Custodial Sentence is Sufficient to Deter Others. ............................ 16

II.     The Sentencing Guidelines Merit a Lenient Sentence. .................................. 17

    A.   Mr. Code Did Not Intend to Cause Any Pecuniary Loss to Louisville. ........ 18

        1.   *The Sentencing Commission Significantly Revised the Definition of "Intended Loss" in the 2015 Guidelines Amendments.* ..................................... 18

        2.   *Mr. Code's Object Was Not to Deprive Louisville Out of Scholarship Funds.* ... 18

    B.   The Probation Office Correctly Concluded That a Sophisticated Means Enhancement is Inappropriate Here. ..................................................................................... 19

III.    THE PSR'S CALCULATION OF RESTITUTION IS INCORRECT. ........................ 19

CONCLUSION ..................................................................................................................... 19

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)............................................................4

*Blakely v. Washington,* 124 S. Ct. 2531 (2004).........................................................4

*Gall v. United States*, 552 U.S. 38 (2007)..........................................................5, 17

*Rita v. United States*, 551 U.S. 338 (2007) ...........................................................5

*United States v. Booker*, 125 S. Ct. 738 (2005)...............................................1, 4, 5

*United States v. Denardi*, 892 F.2d 269 (3d Cir. 1989) ..........................................8

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1998) ........................................7

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ..............................6

*United States v. Hampton*, 441 F.3d 284 (4th Cir. 2006).......................................7

*United States v. Jaber*, 362 F. Supp. 2d 365 (D. Mass. 2005) ...............................7

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) ..........................................7

*United States v. Quinteri*, 306 F.3d 1217 (2d Cir. 2002) ........................................7

*United States v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wisc. 2005) ..........................7

### <u>Statutes</u>

18 U.S.C. § 3553(a) ...........................................................................................1, 5, 6

18 U.S.C. § 3553(a)(2)...............................................................................................6

18 U.S.C. § 3553(a)(4) (Supp. 2004)........................................................................5

18 U.S.C. § 3553(b)(1)...............................................................................................4

18 U.S.C. § 3582........................................................................................................6

18 U.S.C. § 3661........................................................................................................6

18 U.S.C. § 3742(e) ...................................................................................................4

### <u>Other Authorities</u>

U.S.S.G. § 5Hl ...........................................................................................................6

U.S.S.G. at §5C1.1 cmt. n.4 .....................................................................................17

Defendant Merl Code ("Mr. Code") respectfully submits this memorandum in advance of his March 5, 2019 sentencing, to provide information and aid the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 125 S. Ct. 738 (2005).

## INTRODUCTION

The Court presided over the three-plus week trial in this matter, so the Court is familiar with the nature and circumstances of the offenses for which Mr. Code will be sentenced. There is far more to Mr. Code as a person, however, than the evidence at trial revealed—and the 3553(a) factors require a focus not only on the offense, but also on the offender. For the reasons discussed below, Mr. Code respectfully requests that this Court impose a probationary sentence because any sentence within the advisory Guidelines range is – given the particular nature of both the offense and the offender – greater than necessary to comply with the statutory purposes of sentencing.

Mr. Code is deserving of both mercy and leniency. Because of his conviction, Mr. Code's career, at least with respect to college basketball, is finished. He is currently unemployed with a wife and two young children—including a 7-month-old infant son who had a very difficult entry into this world several months before the October 2018 trial of this case. This case has left Mr. Code financially devastated, his reputation significantly damaged, and without an ability to continue pursuing a career in the field he loves. No term of imprisonment is necessary to deter Mr. Code from committing crimes similar to those charged in this case, nor is a term of imprisonment necessary to achieve a just punishment.

Mr. Code has an incredibly loving and supporting family. So supporting, as the Court is aware, that Mr. Code's father placed everything in his life "on hold" to represent his son in this

1

case. Mr. Code's wife, Candance, is the love of his life; and his two sons, Lleyton (age 7) and August (7 months), are his pride and joy. Candance, Lleyton, and August depend on Mr. Code to provide for them on a daily basis, both financially and emotionally. Moreover, because Lleyton and August are both in their formative years, they also depend on Mr. Code to play a primary role in their upbringing, guidance and development. To incarcerate Mr. Code at this stage of their lives would thrust upon his innocent sons the exact type of "extraordinary destruction" that the Second Circuit seeks to avoid.

Furthermore, numerous individuals have written letters to the Court on Mr. Code's behalf. As you will see, the writers of these letters plead for this Court's mercy and compassion as they describe the Merl Code they know as a man with impeccable family values, high integrity, and pristine character. Moreover, many of these letters attest to the substantial punishment that Mr. Code and his family have already suffered because of this case, while also detailing the sheer devastation that a prison sentence would have on his wife and children.

Finally, a probationary sentence would not be a substantial deviation from the 8-month recommendation by the United States Probation Office. Mr. Code very much appreciates careful, thoughtful analysis engaged in by the Probation Office in preparing his Presentence Report. However, he respectfully submits that, notwithstanding this recommendation, a probationary sentence with whatever conditions the Court deems appropriate fully accords with Mr. Code's individual characteristics and circumstances, the offense at issue, and the goals of sentencing.

## BACKGROUND

Mr. Code is a 45-year old resident of Greenville, South Carolina. As detailed above, he is a husband, a father of two young boys, and former college basketball star at Clemson University. After college, he spent most of his career working for Nike, working first in Chicago and then

Portland. Mr. Code was very successful at Nike, rising to the position of Director of Elite Youth Basketball.  However, in the late summer of 2014, Mr. Code quit his job at Nike and moved back home to South Carolina to care for his ailing father, who had recently suffered heart attack, was undergoing treatment for prostate cancer, and recovering from a knee replacement. After Mr. Code returned to South Carolina, he used the relationships he had developed through basketball to work a variety of jobs at Bernhard Energy, Willis Insurance, Gold Coast Wealth Management, SSM Agency, and an apparel company named "Let It Fly" before ultimately accepting a consulting position for Adidas in approximately October of 2016.[1] After Mr. Code was arrested on these charges in 2017 (based in substantial part on conduct encouraged by and undertaken for the benefit of Adidas), he was cut off by Adidas—*i.e.*, Adidas refused to pay him the amount owed on his contract and refused to indemnify him.

As the Court well knows, the charges against Mr. Code arose out of an arrangement in which funds from Adidas were given to the father of a talented high school basketball player – Brian Bowen Jr. – with the hope that Bowen Jr. would agree to play basketball for one of Adidas's sponsored universities:  the University of Louisville. We did not contest these facts at trial—however, although Mr. Code did help facilitate payments from Adidas to the family of Bowen Jr., who ultimately attended Louisville, we cannot agree that he acted with the intent to defraud Louisville or harm it in any way and respectfully part company with the jury's verdict on this critical issue.[2] Furthermore, with the exception of Bowen Jr., Mr. Code did not help facilitate payments to any other student-athlete or their families. As such, Mr. Code was not involved in

---

[1]     As part of its marketing efforts, Adidas sponsors various college basketball programs.

[2]     Louisville was an Adidas-sponsored school that received millions of dollars each year in payments from Adidas, and Mr. Code wished only to help Louisville and its basketball program in a way that was sanctioned by the coaching staff of Louisville.

3

any of the conduct described at trial with respect to the University of Kansas or North Carolina State University.

As it turned out, Bowen Jr. never played a single basketball game for Louisville—and, even after Louisville learned of the payment from Adidas to Bowen Jr.'s family, it offered to maintain Bowen Jr.'s athletic scholarship for four years.  (Tr. 506: 21-24.) Bowen Jr., however, transferred out of Louisville after the first semester of the 2017-2018 school year and now plays basketball in the Australian professional league. (Tr. 529:19-20.) To date, no monetary fines or other penalties have been imposed by the NCAA upon Louisville or any other university in connection with the conduct described at trial.

Mr. Code is a family man, not someone who ever contemplated that anyone would ever view his conduct as criminal in nature. Indeed, Mr. Code has no criminal history and, before this case, he had never been charged with a crime. Like many others, he understood that he was violating the NCAA's rules—but unfortunately, he and his co-defendants are the first to have been convicted of federal crimes based on the theory of prosecution pursued in this case. For these actions – which he deeply regrets – he has already been severely punished.

## APPLICABLE LAW

In 2005, the Supreme Court ruled that its Sixth Amendment holdings in *Blakely v. Washington,* 124 S. Ct. 2531 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) apply to the federal Sentencing Guidelines.  *Booker*, 125 S. Ct. at 756. Based on this conclusion, the Court further found those provisions of the federal Sentencing Reform Act of 1984 ("Sentencing Reform Act") that make the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), or which rely upon the Guidelines' mandatory nature, 18 U.S.C. § 3742(e), incompatible with its Sixth Amendment

4

holding. *Id.* Accordingly, the Court severed and excised those provisions, making the Guidelines effectively advisory. *Id.* at 757.

The Sentencing Reform Act, as revised by *Booker*, requires a sentencing court to consider Guidelines ranges, *see* 18 U.S.C. § 3553(a)(4) (Supp. 2004), but also permits the court to tailor the sentence in light of other statutory concerns. *See* 18 U.S.C. § 3553(a); *see also Booker*, 125 S. Ct. at 757.

District courts are required to properly calculate and consider the Guidelines when sentencing, even though the Guidelines are advisory in nature. *Rita v. United States*, 551 U.S. 338 (2007) (stating that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range); *see also Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."). The Court, in determining the appropriate sentence in a particular case, therefore, must consider the properly calculated Guideline range, the grounds for departure provided in the policy statements, and then the factors under 18 U.S.C. § 3553(a). *Rita*, 551 U.S. at 351.

Under *Booker*, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a). The primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)   to afford adequate deterrence to criminal conduct;
> (C)   to protect the public from further crimes of the defendant; and
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  In addition, when determining a minimally sufficient sentence, Section

3553(a) further directs sentencing courts to consider the following factors:

> (1)  the nature and circumstances of the offense and the history and
> characteristics of the defendant;
>
> . . .
>
> (6)  the need to avoid unwarranted sentence disparities among defendants with
> similar records who have been found guilty of similar conduct; and
>
> (7)  the need to provide restitution to any victims of the offense.

Other statutory sections also give the district court direction in sentencing.  Under 18

U.S.C. § 3582, imposition of a term of imprisonment is subject to the following limitation: in

determining whether and to what extent imprisonment is appropriate based on the Section

3553(a) factors, the judge is required to recognize that imprisonment is not an appropriate means

of promoting correction and rehabilitation.

Under 18 U.S.C. § 3661, no limitation shall be placed on the information concerning the

background, character, and conduct of the defendant, which a court may receive and consider for

the purpose of imposing an appropriate sentence. *See also United States v. Gupta*, 904 F. Supp.

2d 349, 350 (S.D.N.Y. 2012) (explaining that although a sentencing court is required to

"correctly calculat[e] the applicable Guidelines range," that calculation falls "second" to "the

bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a

defendant's character in imposing sentence."). This statutory language certainly overrides the

(now-advisory) policy statements in Part H of the Sentencing Guidelines, which list as not

ordinarily relevant to sentencing, a variety of factors such as the defendant's age, educational and

vocational skills, mental and emotional conditions, drug or alcohol dependence, and lack of

guidance as a youth. *See* U.S.S.G. § 5H1.

The directives of *Booker* and Section 3553(a) make clear that courts should no longer uncritically apply the Guidelines. Such an approach would be inconsistent with the holdings of the merits majority in *Booker*, which rejected mandatory Guideline sentences based on judicial fact-finding, and the remedial majority in *Booker*, which directed courts to consider all of the Section 3353(a) factors, many of which the Guidelines either reject or ignore. *United States v. Ranum*, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005). As another district court judge has correctly observed, any approach which automatically gives heavy weight to the Guideline range "comes perilously close to the mandatory regime found to be constitutionally infirm in *Booker*." *United States v. Jaber*, 362 F. Supp. 2d 365, 371 (D. Mass. 2005); *see also United States v. Hampton*, 441 F.3d 284, 289 (4th Cir. 2006) ("[I]n fashioning a reasonable sentence, district courts must properly calculate the advisory guideline range and then must determine what sentence—one within the advisory range or outside of it—most effectively meets the factors set forth § 3553(a).").

Moreover, a sentencing court should consider a defendant's family circumstances in fashioning an appropriate sentence. Indeed, the Second Circuit has upheld downward departures where the defendants' family circumstances warranted the departure. *See United States v. Johnson*, 964 F.2d 124, 129-30 (2d Cir. 1992) (upholding a downward departure where a mother was the sole caretaker of her children and stating, "[t]he rationale for [the] downward departure . . . [was] not that Johnson's family circumstances decrease[d] her culpability, but that [the court was] reluctant to wreak extraordinary destruction on [her] dependents who rel[ied] solely on the defendant for their upbringing"); *see also United States v. Galante*, 111 F.3d 1029, 1035 (2d Cir. 1998) (upholding a downward departure where the defendant, whose wife spoke little English and had a limited earning capacity, played a primary role in the education, upbringing and support of two young children); *United States v. Quinteri*, 306 F.3d 1217, 1230 (2d Cir. 2002)

7

("we do not doubt" that a defendant could seek a downward departure based on extraordinary family circumstances if she was the sole caregiver to young children).

In sum, in every case, a sentencing court should not merely consider the Guidelines. Rather, the court should consider all of the Section 3553(a) factors, including any extraordinary family circumstances, in determining a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing. And, where the Guidelines conflict with other sentencing factors set forth in Section 3553(a), these statutory sentencing factors should generally take precedence over the Guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J, concurring in part, dissenting in part) (arguing that since § 3553(a) requires that a sentence be no greater than necessary to meet the four purposes of sentencing set forth in subsection 3553(a)(2), the imposition of sentence greater than necessary to meet those purposes violates the statute and is reversible, even if within Guideline range).

## THE APPROPRIATE SENTENCE

## I.  CONSIDERATION OF THE SECTION 3553(A) FACTORS MERITS A LENIENT SENTENCE.

In light of the foregoing, and based on the following analysis of the applicable Section 3553(a) factors, Mr. Code respectfully submits that a probationary sentence is sufficient to comply with the statutory purposes of sentencing.

### A.  <u>Mr. Code's History and Character.</u>

Mr. Code has a strong support system of family and friends, over 30 of which have written this Court to explain that the Merl Code they know is someone who is a valuable contributor to his community and someone worthy of the Court's mercy. (*See Ex. A* (Letters to Judge Kaplan).) These letters describe Mr. Code as a family man, with a good heart, who has always strived to provide for and guide those who are less fortunate. In the words of Mr. Code's

8

wife, Candance, "Merl and I were both taught, that our moral values, integrity, and being a person of our word was the recipe that produces good human character. We were also taught to love God, that family was most important, education was the key, and that whenever and however you could, you should always be willing to assist those less fortunate and give back." (Candance Code Ltr.) Indeed, Candance recalls countless parents telling her, "Merl helped my child when no one else would, no one believed, or many had given up." (*Id.*)

Mr. Code is a great father and "the ultimate boy's dad." (*Id.*) His two boys look up to him, the oldest of which thinks Mr. Code "has magic and the powers of a super hero." (*Id.*) And, although Mr. Code's youngest son is too young to know yet what magic or super heroes are, he "lights up with wide bright eyes and laughter when [Mr. Code] enters a room." (*Id.*) Moreover, as detailed further below, while it is obvious that Mr. Code cares deeply for his immediate family, he cares just as much for his extended family. (*See id.*)

In the words of Mr. Code's mother, Denise, Mr. Code was brought up to respect those who were less fortunate, and "has always been the type of person that wanted to help people, no matter the need." (Denise Code Ltr.) With respect to his two boys, Mr. Code is an "exceptional father." (*Id.*) Indeed, Mr. Code's greatest fear is not being able to be with his two sons to help mold their lives in a way that only their father can. (*Id.*) Furthermore, not only is Mr. Code an "exceptional father," he is also an "exceptional son." (*Id.*) Throughout his career, he has always put his family first. (*Id.*) For example, as detailed above, Mr. Code quit a lucrative job with Nike in order to move back home to Greenville and help his ailing father. (*Id.*) Indeed, it is the thought of being separated from his tight-knit family, along with the uncertainty surrounding his ability to continue providing for them, that presently worries Mr. Code the most. (*Id.*) As Ms. Code has observed first-hand, this case has caused Mr. Code to suffer tremendously.

Mr. Code's mother-in-law, Blondell Tutwiler, is a retired teacher who spent over 30 years teaching children in the Mississippi public school system. (Tutwiler Ltr.) One of her first memories of Mr. Code was when he had the opportunity to play in a basketball game with the then President of the United States, Barack Obama. (*Id.*) To Ms. Tutwiler, simply having the opportunity to play in such a game with the President "spoke volumes about [Mr. Code's] character and integrity." (*Id.*) While living with Mr. Code and Candance for the past 8 months, Ms. Tutwiler has observed the type of family man Mr. Code is. (*Id.*) And, while she has observed Mr. Code positively shape and mold the lives of countless young men, she now sees that he is most concerned about the two young men that mean the most to him, Lleyton and August. (*Id.*) Indeed, as Ms. Tutwiler has attested, to incarcerate Mr. Code at this stage would have a "lasting" and "devastating" effect on his wife and children.

Mr. Code's sister, Whitney, has been "in awe" of her brother since she was a child. (Whitney Code Ltr.) Whitney knows Mr. Code as the type of man who respects others and "has the ability to connect with people because of his sincerity and decency." (*Id.*) To Whitney, one of Mr. Code's best qualities is his ability to lead others by example. (*Id.*) He has always been the type to work harder, stay later, and fight through adversity. (*Id.*) These qualities allowed Mr. Code not only to teach young athletes basketball, but also to teach them life lessons in the process. (*Id.*) Throughout this difficult time, Whitney has seen a man "driven by faith, compassion, respect, and love"—love which Mr. Code's sons "deserve to experience in abundance during their childhood years." (*Id.*)

Mr. Code's brother-in-law, Kelavor Lewis, has known him since 2010. (Lewis Ltr.) To Mr. Lewis, Mr. Code is "an upstanding citizen, loyal friend and truly passionate about helping our youth have a better future." (*Id.*) Mr. Lewis further described Mr. Code as "generous,"

"humble," and a "constant source of strength and support" for his family. (*Id.*) Moreover, like the rest of Mr. Code's family, Mr. Lewis specifically recognizes the devastating effect that incarceration would have on Mr. Code's wife and children, particularly when considering the fact that Lleyton and August are in their "formative years and need their father." (*Id.*)

Adam Harper is Mr. Code's cousin and a member of the New York Bar. (Harper Ltr.) Mr. Harper has always known Mr. Code "to put others before himself[,]" a character trait which Mr. Harper believes allowed Mr. Code to achieve so much success in his career. (*Id.*) Outside of his career, Mr. Harper knows Mr. Code as a "devoted family man" of the "highest character." (*Id.*) Indeed, for the last 55 years, the Code's extended family has had a family reunion every August, complete with fun, laughter, and a family Board of Directors. (*Id.*) Notably, in 2014, Mr. Code was elected as the fifth President of the Code family. (*Id.*)

Many of Mr. Code's friends echo the sentiments of his family members. To Amaris Johnson, who first met Mr. Code when he started dating Candance more than ten years ago, a particular quote from Martin Luther King, Jr. embodies the Merl Code she knows: "The ultimate measure of a man is not where he stands in moments of comfort and convenience, but where he stands at times of challenge and controversy." (Johnson Ltr.) The Merl Code Ms. Johnson knows is a man of "strong Christian faith" who is "selfless in his commitment to his wife and children." (*Id.*) Throughout this case, and despite his own personal circumstances, Ms. Johnson has observed Mr. Code's "unwavering" commitment to his family and community. To remove Mr. Code from them would create a "void" that would be difficult to fill. (*Id.*)

Chana Wells, who meet Mr. Code when they were both student-athletes at Clemson, recalls Mr. Code as a man who "always made it a point to communicate honestly with his colleagues and clientele." (Chana Wells Ltr.) Indeed, the Merl Code Ms. Wells knows is an

"incorruptible" leader, "a man of integrity and honor," and a "genuine family man." (*Id.*)
Another family friend, Phillip Styles, stressed the impact that Mr. Code has in his life as well as
everyone else around him. (Styles Ltr.) Mr. Styles, who has known Mr. Code for nearly 15 years,
knows Mr. Code as a man of "great character" who is "a very loving and supportive father, son
and friend." (*Id.*) As Mr. Styles recognizes, separating Mr. Code from everyone "would do more
harm than good." (*Id.*)

        Deacon John Hackney has known Mr. Code and his family for over 45 years. (Hackney
Ltr.) Over the course of those 45 years, Deacon Hackney cannot recall one instance where Mr.
Code's integrity was called into question. (*Id.*) Rather, Deacon Hackney describes Mr. Code as
an honest man who has always had a "desire to give back to the community." (*Id.*) George
Edwards, who served in the United States Army for 29 years and reached the rank of Colonel,
prides himself on his ability to assess the character of men and women. (Edwards Ltr.) Mr.
Edwards views Mr. Code as a man of "passion" and "integrity" who loves God and his family. In
fact, Mr. Edwards was willing to put his own name and reputation on the line when he gave Mr.
Code his "HIGHEST CHARACTER" recommendation. (*Id.*) (emphasis in original.)

        To Vince Leigh, who has known Mr. Code for more than ten years, Mr. Code is an
"upstanding" man, a "loyal friend," and a "strong contributor to his community." (Leigh Ltr.)
Similarly, Robert Jobe has known Mr. Code for ten years and describes him as a "community
advocate" and a "man of faith, good character, [and] integrity." (Jobe Ltr.) Joseph McCoy, who
has known Mr. Code for nearly 20 years, sees Mr. Code as a "great friend," with "high
character," who serves as a mentor to countless young men across the country. (McCoy Ltr.) To
Pastor Charles Cureton, who has known Mr. Code his entire life, Mr. Code is a "devoted
husband, wonderful father, great son" and an even better friend. (Cureton Ltr.)

Mark Tillmon has known Mr. Code for over 15 years. (Tillmon Ltr.) Mr. Tillmon knows Mr. Code as a man who "truly cares for the welfare of others" and "has always had a keen interest in doing something for the society and giving back." (*Id.*) For these reasons, Mr. Tillmon believes that sentencing Mr. Code to a term of imprisonment would not only damage Mr. Code, but would also negatively affect society as a whole. (*Id.*) Keoki Allen has been a friend to Mr. Code for nearly 20 years. (Allen Ltr.) Throughout their time together, Mr. Code has "proved to be of good moral character" and the "kindest man" Allen knows. (*Id.*) Indeed, Mr. Allen has witnessed Mr. Code speak to and mentor underprivileged children in Chicago in an effort to keep them out of gangs. (*Id.*) And, where circumstances were not as fortunate, Mr. Allen has also witnessed Mr. Code assist with the funeral arrangements of a young man "who died senselessly on the inner city streets." (*Id.*)

Taylor Eskridge, who has known Mr. Code as "a friend who is like family for nearly a decade," describes him as a "gentleman, an excellent father, [and] a loyal husband[.]" (Eskridge Ltr.) As Mr. Eskridge aptly opines, the damage to Mr. Code's reputation, the loss of his career, and, among other things, the embarrassment his family has suffered should constitute "just punishment." (*Id.*) Weyinmi Rose, who is currently a professional basketball player, has known Mr. Code for over 14 years. (Rose Ltr.) To Mr. Rose, Mr. Code has been nothing but a "mentor and positive influence" from the moment they met. (*Id.*) In fact, "[i]n a business where adults are constantly looking to take advantage of young athletes, [Mr. Code] has always gone above and beyond to ensure that [Mr. Rose] was knowledgeable and well prepared for every stage of [his] career." (*Id.*)

Damon Haley, who has known Mr. Code since 2002, knows Mr. Code as a "caring soul" who has always "utilized his professional and civic roles to care for" those in need. (Haley Ltr.)

Similarly, Bryan Bartley recalls Mr. Code as an "extremely kind" and "understanding" friend whose "compassion . . . goes without saying." (Bartley Ltr.) Indeed, Mr. Bartley recalls Mr. Code going out of his way to pay for Mr. Bartley's mother's funeral during a time when neither Mr. Bartley nor his siblings had the financial means to do so. (*Id.*) Along these same lines, Michael Morrison, who has been a close friend for over 20 years, recalls Mr. Code giving him and his daughter a place to stay when Mr. Morrison was between jobs and struggling financially. (Morrison Ltr.) As evidenced by these stories, Mr. Code is the type of friend that can be counted on not only when times are good, but more importantly when times are most difficult.

Eric Elston has known Mr. Code for 15 years. (Elston Ltr.) Throughout their friendship, Mr. Elston has always known Mr. Code, who he described as "extremely kind, dependable, and well regarded among his peers," to be "willing to go the extra mile." (*Id.*) Robert Graham has known Mr. Code for over 20 years. (Graham Ltr.) Mr. Graham knows Mr. Code as the type of friend who will always help someone in need, especially those who are less fortunate. (*Id.*) Furthermore, Mr. Graham recalls spending time with Mr. Code in Chicago, during which they mentored young men in an effort to keep them off the streets and out of gangs. (*Id.*) Indeed, Corey Wells, who has also spent time with Mr. Code in Chicago, described Mr. Code as a man of high integrity, who holds strong values, and is great for his community and society as a whole. (Corey Wells Ltr.) To Mr. Wells, Mr. Code has been "nothing but exemplary" since the day they met. (*Id.*)

Lastly, Leah Granderson, who first met Mr. Code when he and Candance began dating, describes Mr. Code as "unwavering" in the support of his two sons. (Granderson Ltr.) Notably, Ms. Granderson recognizes the "unfortunate rarity" that Mr. Code's sons are blessed with (*i.e.*, having a willing, present and loving father) (*Id.*) Indeed, Ms. Granderson, like many others,

recognizes how debilitating the absence of Mr. Code would be for Lleyton and August. (*Id.*) Ms. Granderson's concerns are echoed by Venice Haynes, who has known Mr. Code since 2010. Ms. Haynes described Mr. Code as "integral to so many lives," particularly to those of Lleyton and August. (Haynes Ltr.) For that reason, Ms. Haynes urges the court to "consider [Mr. Code's] two very young sons . . . who need their father, a wife that needs her husband, and a family and larger community that needs his steady presence . . . ." (*Id.*)

Because of this case, Mr. Code will never be able to work again in the field he loves. All he has left is his family, and he is "undoubtedly the glue that holds [it] together." (Candance Code Ltr.) His wife loves him dearly. And his innocent sons, both of whom "are at a very critical and impressionable stage in life where they need their father[,]" do not deserve to have their father ripped away from them under these circumstances. (*Id.*)

**B.**      **The Nature and Circumstances of the Offense.**

Prior to submitting this Sentencing Memorandum, we have reviewed the sentencing memorandum prepared by Mr. Code's co-defendant, James Gatto. Accordingly, rather than be repetitive, we expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the nature and circumstances of this offense because such arguments apply with equal force to Mr. Code. (*See* Sent. Submission of J. Gatto, at §I.B.)   Based on these arguments, we respectfully submit that the nature and circumstances of the offense here do not require a custodial sentence.

**C.**      **A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.**

As above, we expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the avoidance of unwarranted sentencing disparities with comparable cases, as those arguments likewise apply with equal or arguably greater force to Mr. Code. (*See*

Sent. Submission of J. Gatto, at §I.C.)  In addition, we would like to briefly reiterate the
unfortunate truth detailed in Mr. Gatto's memorandum, which is that payments to talented
college athletes are commonplace and, until the Government brought this case, were generally
understood to be simply a violation of NCAA rules, not a federal crime. Indeed, if one believes
Mr. Gassnola's trial testimony, it has been a long-standing practice at Adidas (and as other
evidence indicates, at other shoe companies and throughout collegiate sports) to violate NCAA
rules. Accordingly, it would be fundamentally unfair to separate Mr. Code from his children and
order him to serve time in prison when many others who have engaged in identical conduct will
go unpunished.  Under Section § 3553(a), Mr. Code's sentence – like the sentence of his co-
defendants – should reflect this disparity, especially when considering that Mr. Code has always
been a law-abiding citizen, a devoted husband to his wife, Candance, and a loving father of his
two young sons, Lleyton and August.

### D.     A Non-Custodial Sentence is Sufficient to Deter Others.

We again expressly join in Defendant Gatto's argument and incorporate by reference his
arguments concerning the need for deterrence and, more specifically, that a non-custodial
sentence is sufficient to deter others under the circumstances of this case. (*See* Sent. Submission
of J. Gatto, at §I.D.) Like Mr. Gatto, Mr. Code's entire life and career as he knew them have
been turned upside down and reduced to ashes. Indeed, even without a custodial sentence, Mr.
Code has been punished substantially.

Specifically, despite Mr. Code's request, Adidas refused to fund his defense in this case
in whole or in part—despite the fact the actions taken by Mr. Code, which led to these charges,
were both directed and encouraged by Adidas. In addition, Adidas also terminated his
employment contract without good cause and has refused to make payments under that contract
since the time of his arrest. As a result, Mr. Code and his parents had to fund his own defense,

16

which financially crippled not only Mr. Code, but has put a strain on the rest of his family. The Court should also be aware that, also as a direct result of this case, Mr. Code is now forced to defend a civil RICO lawsuit in the District of South Carolina. (*See Brian Bowen II v. Adidas America Inc., et al.*, C/A No. 3:18-cv-03118-JFA.) Mr. Code's co-defendants, Adidas and at least one Adidas executive who has not been charged in connection with this investigation, are also named defendants in that case—and Adidas has specifically refused to cover Mr. Code's defense of that civil action as well. If anything at all is presently certain in Mr. Code's life, it is that this case has left him completely ruined. Moreover, the possibility of complete and utter financial ruination resulting from the offense engaged in here is certainly sufficient to deter others from committing similar offenses.

## II.   THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE.

As detailed by Mr. Gatto, although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculate[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50. Here, Mr. Code's Presentence Investigation Report ("PSR"), dated January 18, 2019, (*see* ECF No. 280), calculated an offense level of 17, which equates to a sentence between 24 and 30 months. (PSR, at ¶ 119.) However, the Probation Office itself concluded that a variance below the Guidelines was appropriate here and recommended a sentence of 8 months. (PSR, at pp. 30-31.)

While Mr. Code is grateful for the Probation Office's recommendation of a sentence below the Guidelines range, he respectfully disagrees with the calculation of the applicable Guidelines range found in the PSR. When calculated correctly, the Guidelines result in a base and total offense level of 7, which carries a Guidelines range of 0-6 months. In addition, as a first-time offender, the imposition of a non-custodial sentence is appropriate for Mr. Code. *See* U.S.S.G. at §5C1.1 cmt. n.4 (if a defendant is a "nonviolent first offender and the applicable

17

guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment.").

### A.     Mr. Code Did Not Intend to Cause Any Pecuniary Loss to Louisville.

Mr. Code's base offense level is 7.  (PSR, at ¶ 68.)  The PSR calculates a 10-level enhancement to that offense level based on a proposed "intended loss" of $165,400.00. (PSR, at ¶¶ 58, 61, 69).  The $165,400.00 figure is based upon the Government's contention, which was accepted by Probation, that it was "reasonably foreseeable" to Mr. Code that Louisville would lose funds equal to the face value of a four-year athletic scholarship issued to Brian Bowen Jr., the cost of that scholarship being $41,350.00 per year (PSR, at ¶¶ 58, 61.) As detailed below, however, Mr. Code objects to this enhancement because the PSR's estimate of intended loss is contrary to both controlling law and the factual record.

1.     *The Sentencing Commission Significantly Revised the Definition of "Intended Loss" in the 2015 Guidelines Amendments.*

We expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the Sentencing Commission's 2015 revision of the definition of "intended loss." (*See* Sent. Submission of J. Gatto, at §II.A.(1).) In short, it is inappropriate for the Government to base its intended loss calculation on a claim that it was reasonably "foreseeable" to Mr. Code that his conduct could deprive Louisville of $165,400.00 in scholarship funds. Instead, the Government must demonstrate that Mr. Code "purposefully sought" to inflict these losses upon Louisville, which, based upon the evidence presented at trial, it will be unable to do. (*Id.*) As such, any sentencing enhancement for intended loss is unwarranted.

2.     *Mr. Code's Object Was Not to Deprive Louisville Out of Scholarship Funds.*

Again, we expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the objective of the conduct at issue here, as those arguments likewise

18

apply with equal force to Mr. Code. (*See* Sent. Submission of J. Gatto, at §II.A.(2).) Moreover, while we contend that Mr. Code did not intend *any* loss to Louisville, to the extent that any "intended loss" exists, its calculation should be based on Mr. Code's belief that Bowen Jr. would spend only a year in college. Such a calculation would result in an intended loss amount of $41,350.00 and an enhancement of 6 levels.

        **B.**      **The Probation Office Correctly Concluded That a Sophisticated Means Enhancement is Inappropriate Here.**

We expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the Probation Office's conclusion that a sophisticated means enhancement would be inappropriate in this case. (*See* Sent. Submission of J. Gatto, at §II.B.)

**III.**      **THE PSR'S CALCULATION OF RESTITUTION IS INCORRECT.**

We expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the PSR's incorrect calculation of restitution with respect to Louisville. (*See* Sent. Submission of J. Gatto, at §III.) Specifically, the amount of restitution owed to Louisville should only be $20,675.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court impose a probationary sentence, which is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing. If, however, the Court is inclined to impose a custodial sentence, we respectfully request that the Court follow the recommendation of the Probation Office and impose a sentence of 8 months.

*[SIGNATURE PAGE FOLLOWS]*

Dated:  New York, New York
        February 12, 2019


**NEXSEN PRUET LLC**

By: _/s/ Mark. C. Moore_
Mark C. Moore
Andrew A. Mathias
55 E. Camperdown Way, Suite 400
Greenville, South Carolina 29601
(864) 370-2211

**OGLETREE DEAKINS NASH
SMOAK & STEWART**
Merl F. Code
300 N Main St, Suite 500
Greenville, South Carolina 29601
(864) 271-1300

*Attorneys for Defendant Merl Code*