## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA                          :
                                              :     Case No. 17-cr-00686-LAK
v.                                                :
                                              :
JAMES GATTO,                                      :
a/k/a "Jim,"                                      :
MERL CODE, and                                    :
CHRISTIAN DAWKINS,                                :
                                              :
      Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM
## ON BEHALF OF CHRISTIAN DAWKINS

**HANEY LAW GROUP, PLLC**
Steven A. Haney, Sr.
3000 Towncenter Dr., Suite 2570
Southfield, Michigan 48075
(248) 414-1470
*Attorney for Defendant Christian Dawkins*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

APPLICABLE LAW .........................................................................................................3

ARGUMENT ......................................................................................................................4

I.    CONSIDERATION OF THE 18 U.S.C. § 3553(A) FACTORS MERITS A
      LENIENT SENTENCE. ...........................................................................................4

      A.    Christian Dawkins History And Character .................................................4

      B.    The Nature And Circumstances Of The Offense. .....................................8

      C.    A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted
            Disparities with Comparable Cases. ......................................................12

      D.    A Non-Custodial Sentence is Sufficient to Deter Criminal Conduct and
            There is No Need to Protect the Public From Further Crimes of Mr.
            Dawkins .................................................................................................13

II.   THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE .......................15

      A.    Christian Dawkins Did Not Intend to Cause Any Pecuniary Loss to
            Louisville ...............................................................................................15

      B.    The Probation Office Correctly Concluded That a Sophisticated Means
            Enhancement is Inappropriate Here.......................................................16

III.  THE PSR'S CALCULATION OF RESTITUTION IS INCORRECT. ..........................17

CONCLUSION................................................................................................................17

# TABLE OF AUTHORITIES

Cases

*Gall v. United States*,
 552 U.S. 38, 128 S. Ct. 586 (2007)........................................................................15


Statutes

18 U.S.C. § 3553(a) .........................................................................................1, 4, 8, 13

28 U.S.C. § 994(j).......................................................................................................8

Defendant Christian Dawkins ("Christian") respectfully submits this memorandum in advance of his March 5, 2019 sentencing, to provide information and aid the Court in fashioning a sentence that is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing.

## INTRODUCTION

Your Honor is no doubt familiar with the nature and circumstances of the offenses for which Mr. Dawkins will be sentenced. However, as set forth more fully below, we respectfully request that the court take into consideration Mr. Dawkins' conduct not just over the course of the several months that gave rise to the charges in this case, but also the good character displayed by Mr. Dawkins over the course of his lifetime, as well as his youth and his upbringing. When viewed from this perspective, we respectfully submit that a sentence of probation would constitute a just sentence and one that is sufficient to promote the statutory ends of sentencing.

Christian has the tremendous support of family and friends, many of whom have written letters to Your Honor to emphasize the value and benefit Christian has provided to his family, friends and to society. (*See* Ex. A, (Letters to Judge Kaplan).) For Christian, family comes first. He is a loving son, big brother to his sister Hailee, who currently is a student at Spellman College in Atlanta, Georgia and a surrogate father to his little brother Elijah Dawkins. While the Dawkins family is, and always has been, a basketball family, the individuals who submitted letters on behalf of Christian are not famous basketball players, but instead a diverse cross section of individuals who have known Christian from his infancy to the present, and are able to speak not just to his character, but to the type of young man his mother and father raised.

One constant theme in the overwhelmingly supportive letters submitted on Christian's behalf is the mention of the tragic death of his little brother Dorian Styles Dawkins

1

and the impact his passing had on Christian.  At the young age of 14, Christian's brother Dorian suddenly and unexpectedly died in a summer league basketball game.  His passing made national news and rocked the entire state of Michigan.  There is little question that much of Christian's hunger for success—to "be somebody" in the basketball world—came from the void left by his brother Dorian.  For Christian, becoming a prominent basketball agent was the way he could keep his little brother's memory alive and make his family proud of his success.  Christian spent years learning how the basketball industry worked under prominent agent Andy Miller at ASM Sports.  Then, at the young age of 25, Christian made the ambitious decision to start his own company.  The sports management business that Christian ultimately set out to build was called LOYD Inc., which stands for "Living Out Your Dreams."  Christian was on track to do just that: live out his own dreams and become a successful business manager.

As a result of his trial and conviction, however, Christian's budding and once promising career in the sports management business is decidedly over.  Since his arrest, he has been unemployed and entirely reliant upon his mother and father for his financial support. Throughout this ordeal, including the present, Christian has resided in the basement of his parents' home in Cleveland, Ohio, where he lives with his mother Latrisha, his father, Lou and his two-year old brother Elijah.

Though presently making an effort of exploring a career in the music industry, Christian's days largely revolve around residing in Cleveland and acting as a caregiver and surrogate father to his little brother, Elijah, while his mother father are working full-time at their respective jobs.  The national publicity derived from this case has resulted in Christian's reputation being destroyed and has left him penniless and in debt.  As evidenced by his

PreSentence Investigation Report, Christian literally does not have a dollar to his name and in actuality has a negative worth of nearly $75,000.  (PSR ¶ 108.)

This case has had a profound effect not only on Christian's life but also on his family.  A cursory Google search of the Dawkins's name generates literally hundreds of hits with the labels, "hustler," "con man," and references to how he "ruined college basketball." Christian's father, who as a current NCAA Division I assistant basketball coach at Cleveland State has also felt the scrutiny and infamy of being associated with this trial.  The consequences of this case have rendered Christian, as well as his family, relative pariahs in the college basketball world and very likely has ruined his father's chances of one day securing his own head coaching job—an ambition he has worked tirelessly for decades to achieve.

In sum, Christian and the entire Dawkins family have already been sufficiently punished.  No term of imprisonment is necessary to deter Christian from committing crimes similar to those charged in this case, nor is a term of imprisonment necessary to achieve a just punishment for his actions.  Moreover, a sentence of probation would not be a substantial deviation from the 8-month Guidelines recommendation by Pretrial Services.  As set forth further below, such a departure is warranted here in light of Christian's individual characteristics and circumstances, the offense at issue, and the goals of sentencing that govern the Court's sentencing decision.

## APPLICABLE LAW

The applicable law is discussed in great detail in the sentencing submissions of Mr. Gatto and Mr. Code.  For the Court's convenience, rather than repeat that discussion here, Mr. Dawkins expressly incorporates those portions of his co-defendants' submissions by reference.

3

Mr. Dawkins will only note, very briefly, that the primary directive in Section 3553(a) is for sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant; and
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  In addition, when determining a minimally sufficient sentence, Section 3553(a) further directs sentencing courts to consider the following factors:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
. . .
(3)   the kinds of sentences available;
. . .
(6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)   the need to provide restitution to any victims of the offense.

## ARGUMENT

### I.   CONSIDERATION OF THE 18 U.S.C. § 3553(A) FACTORS MERITS A LENIENT SENTENCE.

In light of the foregoing, and based on the following analysis of the applicable Section 3553(a) factors, we respectfully submit that a probationary sentence is sufficient to comply with the statutory purposes of sentencing.

### A.   Christian Dawkins's History And Character

Christian Dawkins, now 26 years old, was born in Muskogee, Oklahoma and moved to Saginaw, Michigan when he was three years old.  (PSR ¶ 88.)  From the age of three, he resided in Saginaw with his mother, Latrisha, his father, Lou and his two siblings, Dorian,

who passed away in 2009 at the age of 14 from a heart attack, and little sister Hailee, age 20, who is currently a student at Spellman College in Atlanta, Georgia. (PSR ¶ 87.) The Dawkins family was a legacy family in the rough town of Saginaw, and despite the prevalence of crime, was largely immune from the violence of the city, as Christian's father was a well-respected high school basketball player and varsity coach, and his mother, an assistant middle school principal. (PSR ¶ 87.)

During his childhood years in Saginaw, Christian was raised in a very diverse setting and spent time in specialized academic programs. (PSR ¶ 92.) Christian's mother characterized his personality as a youth as "introverted" (PSR ¶ 92.) After he graduated from Saginaw High School, Christian spent one year at Saint Mark's Boarding School in Southborough, Massachusetts, to play basketball at a post-graduate preparatory school. (PSR ¶ 92.) In 2009, he left Saint Mark's when his brother, Dorian, tragically passed away at the age of 14 while playing basketball. Immediately after the tragedy, Christian had a difficult time with his brother's passing, but turned the loss into a positive movement by the creation of a non-profit organization dedicated to raise money for the American Heart Association. (PSR ¶ 92.)

In 2010, upon Christian's return to Saginaw his non-profit foundation, LOYD, Inc. (Living Out Your Dreams) began a mentorship program for at risk youths in the community of Saginaw, as well as the neighboring inner city community of Flint. At that same time, Christian founded a grassroots travel basketball team named Dorian's Pride, in honor of his late brother (PSR ¶ 107.) The travel program, offering opportunities to youth age 12-17, played in tournaments throughout the nation called Show Your Heart, which raised money for the American Heart Association. (PSR ¶ 107.) During this time, Christian attended College in University Center, Michigan, for about one year. His enrollment lasted from August 31st, 2010

through April 6th, 2011, which was interrupted when his father received a new coaching position at Northern Illinois University, prompting the entire family, including Christian's, relocation. (PSR ¶ 101.)

When the Dawkins family relocated to Illinois, Christian continued his studies at Kishwaukee College in Malta, Illinois, where he was enrolled from August 22, 2011 to December 20, 2013.   Christian's passion, however, was basketball and not academic.   He ultimately decided to drop out to pursue his dream of becoming a sports agent in Atlanta, Georgia.  (PSR ¶ 102.)

In 2012, at the young age of only 20, Christian first began reaching out to professionals in the sports management world looking for a guidance and for someone to teach him how the business worked.  He was even bold enough to pitch his idea of a sports marketing company to agents despite not even having a college degree.  But Christian knew that he had a lot to learn. ████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████

Eventually, Christian was hired as a Managing Director for International Management Advisors (IMA) based in Cleveland, Ohio.  This was his first foray into the world of professional sports management, where he was responsible for managing and coordinating the day-to-day activities of the firm's NBA players. ████████████████████████

████████████████████████████████████████
████████████████████████████████████████
██████████████████████

In 2016, he left IMA to seek a more lucrative position with NBA super agent Andy Miller and his agency, ASM. (PSR ¶ 105.) When Christian began working at ASM, he was young and impressionable, with no formal education outside of a high school diploma.

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████

By setting forth this history, we do not mean to attempt to excuse Christian's actions or to make light of the charges in this case. The fact Christian was trained, mentored and often instructed to break the rules, the sort of which ultimately gave rise to the conduct charged, is no excuse for the poor decision making he exhibited in participating in the charged conduct. Rather, the point we wish to convey is that Christian was by no means a criminal mastermind. He was simply a young kid seeking to learn the business from industry professionals and, unfortunately, was given the misimpression that this is just how the world worked. We would respectfully ask the court give consideration to Christian's youth at the time of his actions, with the understanding that Miller's influence would have been far less if Christian had possessed more maturity and life experience, which was undoubtedly lacking in a 21 year old who viewed men like Miller as mentors.

Indeed, the probation department noted that Christian Dawkins did not appear to be "at the top of the decision-making tree for this larger scheme." (PSR ¶ pg. 29.) This combined with consideration of Christian's youth, his loving and supportive family and seemingly bright future ahead, resulted in the probation department's application of 18 U.S.C. § 3553(a) factors in concluding an 8 month sentence would be sufficient not greater than necessary, to comply with the factors to be considered in imposing a sentence outlined in 18 U.S.C. § 3553(a). We submit this reasoning to be consistent with the above and further ask the Court adopt such reasoning to depart from the sentencing guidelines and exercise its discretion in ordering a non-custodial sentence.

**B.    The Nature And Circumstances Of The Offense.**

Mr. Dawkins expressly joins in the arguments concerning the nature and circumstances of this offense in Mr. Gatto and Mr. Code's submissions—because such arguments apply with equal force to Mr. Dawkins. (*See e.g.* Def. Gatto's Sentencing Mem. at Section I(B) (discussing the proposal by the ABA Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes which notes that when a defendant has "zero criminal history points" and his "offense was not otherwise serious" as set forth in 28 U.S.C. §994(j), a "sentence other than imprisonment is generally appropriate" to satisfy the objectives of sentencing.))

As the Court well knows, the charges against Christian Dawkins arose out of an arrangement in which funds from Adidas were given to the father of a talented high school basketball player—Brian Bowen Jr.—with the hope that Bowen Jr. would agree to play basketball for one of Adidas's sponsored universities: the University of Louisville. There is no factual dispute that Christian Dawkins did help facilitate payments from Adidas to the family of Brian Bowen, Jr., who ultimately attended Louisville. But, like co-Defendant Merl Code,

Christian was not involved in any of the conduct described at trial with respect to the University of Kansas or North Carolina State University, and no such nexus was ever suggested, or established at trial. This is particularly relevant as it limits any culpability only to the charges related to the University of Louisville.

At trial, the Government contended that Louisville was defrauded by Christian and his co-defendants because Louisville offered an athletic scholarship to Bowen Jr. even though, unbeknownst to the admissions and NCAA compliance administrators at Louisville, Bowen Jr. was actually "ineligible" to play college athletics since his father, Brian Bowen, Sr., had accepted funds from Adidas. As a result of the charges filed in this case Brian Bowen Jr. never played a single basketball game for Louisville.

Importantly, however, just as there is no factual dispute regarding whether payments were made, there also is no factual dispute that by directing for a payment to be made to Brian Bowen, Sr., Christian Dawkins possessed no intent cause pecuniary harm to the University of Louisville or harm it in any way. There was no evidence presented at trial that Christian Dawkins *desired* for Bowen Jr. to be declared ineligible or that he *desired* for Louisville to sustain financial losses; rather, the Government merely contended that Christian's conduct *exposed* Louisville to financial losses and his conduct was attributable to the loss of a basketball scholarship. (Tr. 49:23-50:1, 58:16-19.). Indeed, Bowen Jr. being declared ineligible such that Louisville would lose a scholarship was *contrary* to Mr. Dawkins' interest.

Truth in fact, Mr. Dawkins did not care whether or not a student-athlete received a scholarship to attend a particular school. All he wanted was for the student-athlete to go to the school that would give the player the best chance to thrive on the basketball court. In order to do so, the student-athlete would need to be eligible. If the student-athlete performed well at the

collegiate level, he would have a better chance at becoming at top NBA draft pick. The better the player's draft position, the more money the player would make as a rookie, which would entitle Mr. Dawkins to a larger fee as the athlete's business manager. It was therefore irrelevant to Mr. Dawkins whether the student-athlete went to school on scholarship or had to pay full tuition.

That Mr. Dawkins's goal was to have the student-athlete choose the university that was the best basketball "fit" is demonstrated in his text messages with Government cooperator Brian Bowen, Sr. After two players from the University of Arizona, Allonzo Trier and Rawle Alkins, announced that they were returning to school, Mr. Dawkins encouraged Bowen Senior to send Tugs to either Creighton or Michigan State because if Tugs went to one of those two schools ████████████████████████████████ Mr. Dawkins recommended that Tugs go to Michigan State, a Nike school, despite the fact that, as Mr. Bowen testified at trial, Michigan State was unwilling to pay Bowen Senior to send him there. (Tr. 685:21-25). Mr. Dawkins recommended Michigan State anyway because he had no interest in whether or not the student-athlete received financial aid, either in the form of a scholarship or in the form of a payment that violated NCAA rules. Mr. Dawkins's goal was simply to put the student-athlete in the best position to succeed at the collegiate level.

This was especially so in light of Christian Dawkins' relationship between he and the Bowen family, namely Brian Bowen, Jr. and Brian Bowen, Sr.—a circumstance that distinguishes Christian from the other defendants in this case. Evidence presented at trial established that Christian and the Bowens had a close relationship for years, and Christian considered the Bowens to be like his family. Christian even referred to Tugs Bowen as being like his son. *See* (DX-5).

10

It was established that Christian Dawkins had a long-standing relationship with the Bowen family and that in his mind, pre-existing relationships between families afforded him some level of immunity (or so he thought) for what otherwise was an NCAA rules violation. There was simply no evidence presented at trial that Christian Dawkins *desired* Louisville to sustain financial losses; rather, the Government contended that Mr. Dawkins, as with the other co-defendants' conduct *exposed* Louisville to financial losses. (Tr. 49:23-50:1, 58:16-19.)

It is with great emphasis that the foregoing does not excuse or justify the actions of Christian Dawkins. Christian accepts the consequences of his actions and offers no excuse for conduct he realizes was wrong. Yet at the same time, no evidence exists, or is suggestive, he acted with any intent to cause pecuniary harm to the University of Louisville.

Despite the acknowledgments herein, it is important to note, as was emphasized in the Presentence Investigation Report, the conduct at issue in this case is commonplace in college athletics. For decades, the vast majority of individuals who participated in the same conduct for which Christian Dawkins was convicted did so without criminal sanction. In fact, his own bosses at ASM Sports, the benefactors of such conduct, somehow were immune from prosecution in this case. And, even in the few instances where individuals have served custodial sentences, there is little doubt that those cases are the exception. In sum, the facilitation of payments to talented college athletes is commonplace and has historically been considered a mere violation of NCAA rules, not a federal crime. Accordingly, given the unique nature and circumstances of this alleged offense, a "sentence other than imprisonment is generally appropriate" and we would ask the Your Honor recognize this benchmark and depart from the 8 month recommendation and impose a non-custodial period of supervision.

**C.     A Non-Custodial Sentence is Appropriate in Order to Avoid Unwarranted Disparities with Comparable Cases.**

As above, we expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the avoidance of unwarranted sentencing disparities with comparable cases, as those arguments likewise apply with equal force to Christian Dawkins. (*See* Def. Gatto's Sentencing Mem. at Section I(C).)   In addition, we would like to briefly reiterate the unfortunate truth detailed in Mr. Gatto's memorandum, which is that payments to talented college athletes are commonplace and, until the Government brought this case, were generally understood to be simply a violation of NCAA rules, not a federal crime.

But the need to avoid unwarranted disparities exists not only when Mr. Dawkins is compared to the many unknown others who have engaged in this behavior, but also when compared to other known participants in the very same charged conduct.   Indeed, the Government provided non-prosecution agreements to several individuals whom the FBI investigated and concluded were involved in conduct similar to Mr. Dawkins's.   For example,

All of these actions rendered Koprivica ineligible for NCAA competition and therefore would have caused Louisville to provide a scholarship to an ineligible athlete—the exact same harm alleged to have been caused by Mr. Dawkins in this case.

Brian Bowen Sr., the person who was responsible for his son's failure to disclose his NCAA ineligibility on his compliance forms, also received a non-prosecution agreement from the Government. ███████████  Yet, Bowen Sr. had been soliciting and receiving money for his son's talents, in violation of NCAA rules, since his son entered high school. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████  The other parents who accepted funds from Adidas and were directly responsible for submitting false certifications to the Universities, namely, Dennis Smith Sr., Nicole Preston, and Fenny Falmagne, have also never been the target of law enforcement and will face no criminal penalty of any sort.

Similarly, no other employees at ASM were ever charged in this case, including Miller, who since has been decertified and banned from the NBA.

We submit it would be unjust for Christian Dawkins to be made an example through incarceration, when so many people who have engaged in the exact same type of conduct have never been, and will never be, criminally charged.   Under Section § 3553(a), Christian's sentence should reflect this disparity, especially when considering that he has always been a law abiding citizen, devoted brother and the primary caregiver for his little brother.

**D.     A Non-Custodial Sentence is Sufficient to Deter Criminal Conduct and There is No Need to Protect the Public From Further Crimes of Mr. Dawkins**

We again expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the need for deterrence and, more specifically, that a non-custodial sentence is sufficient to deter others under the circumstances of this case.  (*See* Def. Gatto's Sentencing Mem. at Section I(D).)  Christian's entire life and career as he knew them have been turned upside down and reduced to one of little hope.  There is no doubt that even

without a custodial sentence, Christian Dawkins, as well as his entire family have been punished substantially.

Furthermore, the public humiliation associated with being indicted, tried and convicted of a crime, especially on a national stage at such a young age, is severe.  The experience of seeing one's face and name pinned to the pages of the internet, newspapers and sports media outlets is extremely difficult, and is made even worse when one knows that his entire family will forever face the public embarrassment for you years to come.

Christian Dawkins' infamy, perhaps more than any of the Defendants in this case, has been eagerly reported by news writers around the world, especially those working in the sports industry.  Any sports fan who has so much paid attention to ESPN has received the message loud and clear—giving impermissible benefits to student-athletes is more than just an NCAA violation.  Christian does not need to be incarcerated to get that message across, as he is likely to be reminded of it every day for the rest of his life and certainly will never again be in the professional context positioned to make such choices.

Finally, while Christian Dawkins fully understands and does not attempt to trivialize the seriousness of this case, there is no need for specific deterrence here.  Christian certainly does not pose a threat to the public, and evidences no prior criminal history and, prior to this case, had never even been charged with a crime.  There is no point of reference one could ever make to suggest that Christian Dawkins would have a propensity to be violent, or pose a threat to anyone in society.

This conviction is an aberration in a life that has otherwise been characterized by law-abiding behavior.  In his young life, Christian has held nothing but the greatest respect for

the law and certainly never exhibited any traits of a criminal, or one who absent incarceration, would pose a threat, or be a menace to society.

In sum, Christian Dawkins' entire life, in part by his own misguided volition, is largely ruined and will never be the same.  As a result of this case, he will never work again in the sports management business and be saddled with multiple felony convictions, thereby vastly limiting his professional opportunities in any capacity.   This punishment alone would is sufficient.  In short, there is absolutely no risk of recidivism here, and there is nothing to suggest that the public needs to be protected from Christian Dawkins.  For these reasons, we submit that a probationary sentence is appropriate.

## II.   THE SENTENCING GUIDELINES MERIT A LENIENT SENTENCE

Although a sentencing court does not need to follow the Sentencing Guidelines, it is required to "correctly calculate[e] the applicable Guidelines range" before imposing a sentence. *Gall*, 552 U.S. at 49-50.  In the present instance, the Presentence Investigation Report recommends a sentence of 8 months based on an offense level of 11.   Christian very much appreciates the careful consideration and thoughtfulness of the Probation Office, although he does, respectfully disagree, with Probation's calculation of loss, as described below.  In addition, as a first-time offender, the imposition of a probationary sentence is appropriate for Christian Dawkins.

### A.   Christian Dawkins Did Not Intend to Cause Any Pecuniary Loss to Louisville

Christian Dawkins' base offense level is 7.  (PSR, at ¶ 68.)  The PSR calculates a 10-level enhancement to that offense level based on a proposed "intended loss" of $165,400.00. (PSR, at ¶¶ 58, 61, 69.)  The $165,400.00 figure is based upon the Government's contention, which was accepted by Probation, that it was "reasonably foreseeable" to Mr. Dawkins that

Louisville would lose funds equal to the face value of a four-year athletic scholarship issued to Brian Bowen Jr., the cost of that scholarship being $41,350.00 per year (PSR, at ¶¶ 58, 61.)  As detailed below, however, Christian Dawkins objects to this enhancement because the PSR's estimate of intended loss is contrary to controlling law and the factual record for the reasons detailed in Mr. Gatto's submission, which we expressly join in and incorporate by reference.

The Government cannot and did not point to a single instance in which Christian Dawkins expressed an interest in depriving Louisville out of scholarship funds.  As noted above, the means by which Bowen Jr. paid for college – *e.g.*, through his parents, through student loans, or through an athletic scholarship—were entirely irrelevant to Christian.

Moreover, while we contend that Christian did not intend ***any*** loss to Louisville, to the extent that any "intended loss" exists, its calculation should be based on Christian's *subjective* belief that Bowen Jr. would spend only a year in college.  As the Government is well aware, pursuant to the evidence presented at trial by its own cooperating witness Brian Bowen Sr., both he and Mr. Dawkins believed that Bowen Jr. would be a "one and done" player— meaning he would "go to school for one year and then get drafted."  (Tr. 622:11-18; GX 51T). Such a calculation would result in an intended loss amount of $41,350.00 and an enhancement of 6 levels; as opposed to the Government's proposed "intended loss" calculation of $165,400.00— which is unjustifiable given the explicit factual record.

### B.   The Probation Office Correctly Concluded That a Sophisticated Means Enhancement is Inappropriate Here

We expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the Probation Office's conclusion that a sophisticated means enhancement would be inappropriate in this case.  (*See* Def. Gatto's Sentencing Mem. at Section II(B).)

16

### III.     THE PSR'S CALCULATION OF RESTITUTION IS INCORRECT.

We expressly join in Defendant Gatto's argument and incorporate by reference his arguments concerning the PSR's incorrect calculation of restitution with respect to Louisville.  (*See* Def. Gatto's Sentencing Mem. at Section III.)   Specifically, the amount of restitution owed to Louisville should only be $20,675 because Bowen Jr. attended Louisville for half of the year.

### CONCLUSION

For the foregoing reasons, we respectfully request that the Court impose a probationary sentence, which is "sufficient, but not greater than necessary" to achieve the statutory purposes of sentencing.

Dated:     New York, New York
           February 12, 2019

**HANEY LAW GROUP, PLLC**

By: *Steven Haney*

Steven A. Haney, Sr.
3000 Towncenter Dr., Suite 2570
Southfield, Michigan 48075
(248) 414-1470

*Attorneys for Defendant Christian Dawkins*

17